This case is now before us for the second time. It was originally here on an appeal by the defendant from a judgment permanently enjoining him from advertising and selling cigarettes at less than cost in violation of the "Unfair Sales Act," Act No. 338 of 1940, as amended by Act No. 79 of 1942 and Act No. 256 of 1946. Finding that we had no jurisdiction in the matter, we transferred the case to the Court of Appeal for the Second Circuit under the authority of Act No. 19 of 1912.212 La. 1015, 34 So.2d 58. That court is now certifying to us for our answer, under the authority of Section 25 of Article VII of the Constitution of 1921, the question of the constitutionality vel non of this act and we, under the authority of this same section and in order to avoid any further delay in returning the case with instructions, have concluded to "decide the whole matter in controversy in the same manner as if it had been on appeal directly to the Supreme Court."
The simple question posed in this case has been answered adversely to the contention of the appellant by the courts of the thirty states of the Union that have had *Page 4 
occasion to review the similar acts adopted by their respective legislatures. See Wholesale Tobacco Dealers Bureau v. National Candy Tobacco Co., 11 Cal.2d 634, 82 P.2d 3, 118 A.L.R. 486; Rust v. Griggs, 172 Tenn. 565, 113 S.W.2d 733; McElhone v. Geror, 207 Minn. 580, 292 N.W. 414; Associated Merchants v. Ormesher, 107 Mont. 530, 86 P.2d 1031; State v. Langley, 53 Wyo. 332,84 P.2d 767; State v. Sears, 4 Wn.2d 200, 103 P.2d 327; Moore v. Food Dealers Ass'n, 286 Ky. 24, 149 S.W.2d 755; Dikeou v. Food Distributors Ass'n, 107 Colo. 38, 108 P.2d 529; Carroll v. Schwartz, 127 Conn. 126, 14 A.2d 754; Blum v. Engelman, Md.,57 A.2d 421. The underlying principle upon which these decisions are based has the support of the decisions of the Supreme Court of the United States. Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469; Northern Securities Co. v. United States, 193 U.S. 197, 24 S.Ct. 436, 48 L.Ed. 679; Townsend v. Yoemans, 301 U.S. 441, 57 S.Ct. 842, 81 L.Ed. 1210; Kunsman v. Max Factor Co., 299 U.S. 198, 57 S.Ct. 147, 81 L.Ed. 122; Old Dearborn Distributing Co. v. Seagram-Distillers Corporation, 299 U.S. 183, 57 S.Ct. 139, 81 L.Ed. 109; Hegeman Farms Corporation v. Baldwin, 293 U.S. 163, 55 S.Ct. 7, 79 L.Ed. 259; Highland Farms Dairy v. Agnew, 300 U.S. 608, 57 S.Ct. 549, 81 L.Ed. 835.
The great strides made by mass production and the development of national *Page 5 
brands of standard consumers' goods exploited by advertising addressed directly to the public since the beginning of the century have been paralleled by increased and intensified competition, with its resultant effect upon the economic welfare of the citizen and the merchant. To combat the monopolistic dangers inherent in the concentration of retail distribution in the hands of large and richly-financed distributive units seeking to secure an increasingly large share of the retail market in all nationally advertised brands, and to protect the small and independent retailers from gradual liquidation by reason of the varied schemes devised to "kill off" the competition they afford, the law-making bodies throughout the various states of the country early in the century undertook to restrain the inexorable tendency of these practices by enacting legislation designed to elimate the employment of questionable devices for the studied purpose of injuring competitors. Such devices were condemned in these acts as being inimicable to the public welfare and to the economic stability of the community.
Among one of the most common of these devices is the so-called "loss leader", employed under the guise of an advertising scheme but characterized as "bait" by the late Justice Brandeis of the United States Supreme Court in an article written before his elevation to the bench. Justice Brandeis also said this device would be more appropriately termed a "mis-leader" *Page 6 
because its very purpose is, ordinarily, "to create a false impression." This observation, made in 1913, is equally true today. "Loss leader" is the term applied to the practice of selling nationally known articles at cost or less than cost for the calculated purpose of enticing customers away from competitors and into stores where they may be entrapped into purchasing other goods at marked-up prices that will more than make up for the loss on the "leader." Such practices tend to bankrupt the small merchants and to create monopolies by the concentration of distribution in the hands of a few well-financed groups. In addition, they are inimicable to sound and honest merchandizing.
Beginning with South Carolina's rather feeble initial attempt to cope with this problem in 1902, the states have gradually and increasingly strengthened legislation levelled at preventing the unreasonably low pricing of goods for the purpose of destroying competition or of eliminating an individual competitor while at the same time deluding the public. Today all but three states have fair trade statutes of some kind. Some thirty states have statutes that are designated generally as Unfair Practices Acts or Unfair Sales Acts. These acts all follow the same general pattern, the only practical difference being that the method employed in computing the cost of the article varies.
The legislature of Louisiana, following this trend and expression of public policy, *Page 7 
adopted in 1940 its Unfair Sales Act, the express object of which, according to its title, is "to protect the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair sales and discriminatory practices by which fair and honest competition is destroyed or prevented." The act, as amended, makes it unlawful for any retailer or wholesaler, with the intent or effect of unfair competition, to advertise, offer to sell, or sell, any merchandise at less than cost. "Cost" is defined in Section 2 to be the invoice cost, or the replacement cost within thirty days prior to the date of sale, whichever is lower, less all trade discounts, except customary discounts for cash, and plus freight charges, cartage and certain taxes, and also plus a markup to cover a proportionate part of the cost of doing business, which markup, in the absence of proof of a lesser cost, is fixed at six per cent for retailers and two per cent at the wholesale level. Section 6 of the act excepts from the operation of its provisions all out of the ordinary situations where a sale at less than cost may be necessary, such as bankruptcy sales, sales to the highest bidder of confiscated goods, and those situations where the price of merchandise has been made in good faith to meet conpetition. Any violation of the act is made a misdemeanor in Section 4, punishable by a fine of not less than $25 and not more than $500 for each offense. Section 5 vests the courts of the state with jurisdiction to *Page 8 
prevent and restrain violations of the act and authorizes any person damaged or threatened with loss or injury by reason of its violation to sue for and secure injunctive relief. It is also made the duty of the district attorneys throughout the state to institute proceedings to prevent and restrain violations of the act.
The defendant in this case, I. Rosenzweig, doing business as the Pic-Kwickly Grocery, located at Tallulah, Louisiana, in Madison Parish, in answer to the suit filed against him by the Louisiana Wholesale Distributors Association, Inc., a nonprofit corporation composed of a large group of wholesale tobacco and grocery distributors of Louisiana, commonly known as jobbers, admitted the allegations contained in the petition charging him with having advertised and sold certain popular brands of cigarettes at less than cost, in violation of the Unfair Sales Act, stating that he used them as a "loss leader" in an effort to stimulate his general grocery business. As a defense, he urged that the act is unconstitutional because it violates the due process and equal protection guaranteed him under the Fifth and Fourteenth Amendments of the Constitution of the United States, and under Section 2 of Article I of the Constitution of Louisiana, contending that such a statute is, in fact, a price fixing statute and class legislation, precluding him from freely contracting with regard to his property.
Upon this constitutional issue there was judgment in the lower court decreeing Act *Page 9 
338 of 1940, as amended, to be constitutional and granting the plaintiff the injunctive relief prayed for.
The leading case on this subject, Nebbia v. New York,291 U.S. 502, 54 S.Ct. 505, 516, 78 L.Ed. 940, 89 A.L.R. 1469, brought to the Supreme Court of the United States for its decision the question of the constitutionality of a New York milk control law that had been adopted for the purpose of thwarting harmful competition. Under this law the administrative board issued regulations fixing the minimum price that could be charged for milk by the quart and pint and Nebbia, when charged with the violation of these minimum price regulations, asserted as his defense that the statute and regulation contravened the equal protection and due process clauses of the Constitution of the United States. His argument before the United States Supreme Court was that the board's order discriminated unfairly against him as a "cash-and-carry" dealer in milk since his rivals in the trade who had no store but only a wagon and delivery route had no lower limit set for the price at which they were obliged to buy his milk and were allowed to sell pints of milk as low as he did, with delivery to the customer's door as a bonus. In upholding the constitutionality of the regulations issued under the Milk Control Law, the court made the following pertinent observations that are equally applicable in the case now before us: *Page 10 
 "So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is freeto adopt whatever economic policy may reasonably be deemed topromote public welfare, and to enforce that policy bylegislation adapted to its purpose. The courts are without authority either to declare such policy, or, when it is declared by the legislature, to override it. If the laws passed are seento have a reasonable relation to a proper legislative purpose,and are neither arbitrary nor discriminatory, the requirementsof due process are satisfied, and judicial determination tothat effect renders a court functus officio. `Whether the free operation of the normal laws of competition is a wise and wholesome rule for trade and commerce is an economic question which this court need not consider or determine.' Northern Securities Co. v. United States, 193 U.S. 197, 337, 338, 24 S.Ct. 436, 457, 48 L.Ed. 679 [700, 701]. And it is equally clear that if the legislative policy be to curb unrestrained and harmful competition by measures which are not arbitrary or discriminatory it does not lie with the courts to determine that the rule is unwise. With the wisdom of the policy adopted, with the adequacy or practicability of the law enacted to forward it, the courts are both incompetent and unauthorized to deal. The course of decision in this court exhibits a firm adherence to these principles. Times without number we have said that the Legislature is primarily the judge of the necessity of such an enactment, *Page 11 
that every possible presumption is in favor of its validity, and that though the court may hold views inconsistent with the wisdom of the law, it may not be annulled unless palpably in excess of legislative power. * * * The constitution does not secure to anyone liberty to conduct his business in such fashion as to inflict injury upon the public at large, or upon any substantial group of the people. Price control, like anyother form of regulation, is unconstitutional only if arbitrary,discriminatory, or demonstrably irrelevant to the policy thelegislature is free to adopt, and hence an unnecessary andunwarranted interference with individual liberty." (Italics ours.)
In the landmark case of Wholesale Tobacco Dealers Bureau v. National Candy Tobacco Co., 11 Cal.2d 634, 82 P.2d 3, 9, 118 A.L.R. 486, the California Supreme Court upheld the constitutionality of the California Unfair Practices Act of 1913, as amended (an act that is for all intents and purposes identical with the one here being considered), despite the attack made upon it by the defendant, enjoined from selling its products below cost or replacement cost, whichever was the lower, plus the cost of doing business as defined in the act, epitomizing in the following excerpt from its opinion the attitude of the courts with respect to the legality of such statutes:
"That the avowed purpose of the act as stated in section 13 `* * * to safeguard the public against the creation or *Page 12 
perpetuation of monopolies and to foster and encourage competition, by prohibiting unfair and discriminatory practices by which fair and honest competition is destroyed or prevented' — is well within the state's police power cannot be seriously doubted. It has now become firmly established that the policepower of the state extends not only to the preservation of thepublic health, safety and morals, but also extends to thepreservation and promotion of the public welfare. In recent years the state, in promoting and advancing the general welfare of its citizens, has frequently and properly used this power to promote the general prosperity of the state by the regulation of aconomic conditions. This apparent extension of the police power is in fact no extension at all. The police power has not expanded. Its proper exercise has always been and still isconfined to regulation in the public welfare, and has alwaysbeen and still is subject to the standard of reasonableness inits relation to that interest. However, changed social, political and economic conditions have enlarged the field of conduct which may properly be subjected to regulation in order that the general welfare may be adequately protected. The properapplication of the power cannot be measured by past precedents— the test is, of course, present day conditions. These principles have frequently been enunciated by this court and by the Supreme Court of the United States. * * * That the prevention of monopolies and the fostering of free, open and fair competition and the prohibition *Page 13 
of unfair trade practices is in the public welfare is obvious, and requires no further citation of authority." (Italics ours.)
The case relied on by the defendant is Great Atlantic Pacific Tea Co. v. Ervin, D.C., 23 F. Supp. 70. The statute under which this case was decided has since been superseded by an act of the Minnesota legislature that is practically identical with the one here under consideration, and the constitutionality of this later act was upheld by the Supreme Court of Minnesota in the case of McElhone v. Geror, 207 Minn. 580, 292 N.W. 414, 417, wherein it is said:
"Until recently it was thought, incorrectly, that outside the field of businesses conducted under a franchise and enterprises which, historically, were considered subject to price regulation, the fixing of prices was permissible only where the business was `affected with a public interest.' Tyson Bro. v. Banton, 273 U.S. 418, 47 S.Ct. 426, 428, 71 L.Ed. 718, 58 A.L.R. 1236; Williams v. Standard Oil Co., 278 U.S. 235, 49 S.Ct. 115, 73 L.Ed. 287, 60 A.L.R. 596. That doctrine, which put price control in a different category from other forms of state regulation, has been disapproved. In Nebbia v. New York, supra, it was said: `Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the Legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty.'" *Page 14 
Such acts have consistently been held not to be price fixing statutes. They merely fix the level below which producers and distributors many not sell without injury to a competitor and, ultimately, to the community. Clearly, therefore, in adopting this state's Unfair Sales Act for the protection of our economic structure and to prevent the creation or perpetuation of monopolies, the legislature was acting well within its police power. And since the act has neither been alleged nor shown to be arbitrary or discriminatory and an examination of its context shows it is broad in its scope and uniform and fair in its operation and is not violative of any of the personal or contractual rights guaranteed to our citizens by the federal and state constitutions, it is our conclusion that the statute is consitutional.
For the reasons assigned the judgment of the district court, granting the injunctive relief prayed for, is affirmed.