HAMITER, Justice.
 

 For consideration in this cause is the question of constitutionality of certain provisions of Act 360 of 1948, the title to which commences, “To license, regulate and control all traffic in beverages containing .more than six per centum of alcohol by volume * *
 

 The statute, among other things, creates a board known as the Louisiana Board of Alcoholic Beverage Control composed of three members, each of whom must devote his full time to the performance of his official duties, and it authorizes the Board’s adoption of rules and regulations for the enforcement of the statutory provisions; it provides for the issuance by the Board •of permits or licenses to dealers (manufacturers, wholesalers and retailers) as a ■condition for engaging in the liquor business in the state; it stipulates for each wholesaler and retailer a mandatory minimum mark up over his cost in the sale of the affected beverages, and charges the Board with the duty of enforcing the mark up (the appropriate provisions are hereinafter quoted in full) ; it prohibits certain immoral, improper and indecent acts or practices on licensed premises; it requires every retailer to pay in full his obligation for each alcoholic beverage purchase within 30 days after it becomes due, the due date being fixed as not later than the fifteenth day following that in which actual delivery is made; it authorizes the Board to suspend or revoke a permit for the violation of any provision of the statute; and it sets forth the procedure to be followed in the suspension or revocation of permits.
 

 Plaintiff herein, Schwegmann Brothers, is a commercial partnership doing business in the City of New Orleans, operating there a retail self-service market on a cash and carry basis. It merchandises groceries, meats, poultry, drugs, light hardware, alcoholic beverages and other items. Charged with a violation of the provisions of Act 360 of 1948, in that (and only that) it made sales of alcoholic beverages at prices below the minimum mark up required of retailers by the statute, plaintiff was ordered to appear hefore the Louisiana Board of Alcoholic Beverage Control and show cause why its off-premise liquor license should not be suspended. On appearing, it admitted making the sales; but it challenged the constitutionality of the legislation under-which the charge was .made. The hearing resulted in an order of.. the
 
 *155
 
 Board suspending plaintiff’s retail liquor permit for 30 days, commencing January 29, 1949.
 

 Thereupon plaintiff instituted this proceeding (referred to in the petition as an appeal) in the Civil District Court of Orleans Parish against the Louisiana Board of Alcoholic Beverage Control seeking injunctive relief with respect to the enforcement of the order suspending its liquor permit. In the petition, after admitting the making of the violative sales, it attacked numerous provisions of Act 360 of 1948, alleging their unconstitutionality on various and sundry grounds.
 

 On the filing of the petition the court granted a temporary restraining order preventing, until such time as the cause could be disposed of, defendant’s interference with plaintiff’s business. However, the order (for its duration) was conditioned upon plaintiff’s observing and complying with the provisions of the assailed statute. Later, on the hearing of a rule nisi, a preliminary writ of injunction issued, continuing in effect the restraining order.
 

 ■ To plaintiff’s petition defendant tendered a plea of estoppel and exceptions of no right and no cause of action, all of which were referred by the court to the merits of the case. Then it answered denying generally plaintiff’s several allegations of unconstitutionality.
 

 Joining defendant in urging the constitutionality of the statute were the Louisiana Wholesale Liquor Dealers Association and the Louisiana Retail Liquor Dealers Association, as well as numerous individual wholesale and retail liquor dealers, they appearing by way of petitions of intervention. Also intervening, but supporting the position of plaintiff, were seven New Orleans citizens who alleged themselves to be representative of the great body of consumers in this state,- and Gus Blancand, another citizen of that city, who is engaged in the wholesale liquor business.
 

 After a trial of the merits the court rendered and signed a judgment decreeing “that the order of the Louisiana Board of Alcoholic Beverage Control, dated January 29, 1949, suspending the retail liquor permit of Schwegmann Brothers, be set aside and that the Louisiana Board of Alcoholic Beverage Control, its officers, agents and employees be permanently enjoined, restrained and prohibited from enforcing said order of January 29, 1949, suspending the permit of Schwegmann Brothers as a retail liquor dealer, and from interfering in any manner with the operation by Schwegmann Brothers of its retail liquor business at 2222 St. Claude Avenue, in the City of New Orleans, Louisiana, because of any violations of Section l(s), Section 24 and Section 26 of Act 360 of 1948.” Further, the judgment ordered that all petitions of intervention be dismissed.
 

 In granting to plaintiff the relief for which it prayed the district judge (as his
 
 *157
 
 written reasons appearing in the record disclose) concluded that the provisions of the statute relating to the minimum mark lips (Sections l(s), 24 and 26) are unconstitutional in that they delegate to private persons legislative power. He said:
 

 “By these three sections, construed together, the Louisiana Legislature has delegated to the manufacturers of alcoholic ■beverages the right to fix the minimum prices of such beverages in the State of Louisiana at all distributive levels, without regard to the reasonableness or unreasonableness of such prices.
 

 “While the legislature of the State of Louisiana may under the police power en.act laws for the safety, health, morals .and economic welfare of the people, it cannot delegate the exercise of legislative •power to private persons. Those three sections of the Act are therefore unconstitutional.”
 

 Also, the district judge concluded to be •unconstitutional Section 64(f) insofar as it provides that “orders of the Board suspending or revoking permits shall not be suspended by any court,” and Section 64(h) which stipulates that the courts of this •state shall have no jurisdiction to issue restraining orders and writs of injunction ■or to suspend or stay any action of the Board during the pendency of appeals to the courts. These provisions, he commented, contravened Section 2 of Article VII of the Louisiana Constitution which .empowers the several courts, in aid of 'their respective jurisdictions, to' issue any and all needful writs, orders and process.
 

 Appeals from the judgment were perfected by the defendant and its several supporting intervenors.
 

 Under defendant’s plea of estoppel and exception of no right of action, both.of which were impliedly overruled by the district court and are re-urged here, appellants contend that as a licensee plaintiff has no right (it is estopped) to attack the statute under which it holds a permit.
 

 This contention, in which we find no merit, has as its basis the doctrine of waiver or estoppel to assert the invalidity of a law. But essential to that doctrine is the element of voluntary action which is completely lacking here, resulting in the case falling within one of the frequently occurring exceptions. In 11 American Jurisprudence verbo Constitutional Law, Section 124, it is said: “The most important and frequent class of exceptions to the general doctrine of waiver or estoppel to assert the invalidity of a law is that where a statute requires a duty which is mandatory in form, accompanied by penalties for failure to obey its provisions, or is otherwise coercive. In such cases the element of voluntary action essential to waiver or estoppel is absent. * * * ”
 

 This exception to the general doctrine is recognized in our jurisprudence. When the defendant in State v. Becker, 30 La.Ann. 682, refused to pay a license for the opera
 
 *159
 
 tion of a beer saloon as required by Act 14 of 1872 judicial proceedings against him were instituted. Thereupon, he tendered the amount of the license to the collector and attacked the constitutionality of the statute. In discussing the question of waiver or estoppel, this court observed: “Do his tender and deposit preclude him from urging the unconstitutionality of the license imposed on his calling? They do not: the tender and deposit were made under circumstances which repel the presumption that they were voluntary: they were the direct and immediate consequence of a threatened seizure, of an injunction already allowed, the execution of which would have, at least, suspended defendant’s-business.”
 

 True, the appellee here did not make application for its permit as a consequence of an injunction or a threatened seizure. A sort of coercion, however, attended the obtaining of it, for appellee was required by the statute to be licensed (if it operated) on pain of receiving criminal penalties and of the closure of its business.
 

 To hold applicable the doctrine of estoppel in a case of this kind would be to place the liquor dealer in a two-horned dilemma, from the choosing of either horn of which detriment might result to him. Thus, if he refuses to apply for the license, maintaining' that-’ certain statutory conditions surrounding its issuance violate his constitutional rights, he may be severely penalized; : if, on the other hand, he secures the permit he is denied the right of attacking the constitutionality of the statutory conditions.
 

 But the law does not prevent such an attack. The United States Supreme Court has said specifically that the acceptance of a required statutory license does not impose on the licensee an obligation to respect or to comply with any provisions of the statute that are repugnant to the constitution. Cargill Company v. State of Minnesota ex rel. Railroad & Warehouse Commission, 180 U.S. 452, 21 S.Ct. 423, 45 L.Ed. 619. And the soundness of this view cannot be denied. The immunization of a law from constitutional attack by the simple expedient of requiring licenses from those in a business sought to -be regulated clearly would be inharmonious with our American system of checks and balances.
 

 Inapplicable here is State ex rel. Orleans Athletic Club et al. v. Louisiana State Boxing Commission, 163 La. 418, 112 So. 31, cited and relied on by appellants’ counsel. Therein the relators did not question the constitutionality of the statute under the provisions of which their license issued.
 

 Additionally, appellants’ counsel urge here, under the overruled exceptions of no right and no cause of action, that since plaintiff has no inherent right to engage in the liquor business it cannot attack as being unconstitutional the statute which grants the privilege, subject to stipulated conditions for selling intoxicants. The'y-
 
 *161
 
 argue: “Matters which are considered as rights when applied to other circumstances under different conditions, cease to he rights and become mere conditions of the privilege when applied to the liquor traffic, because, first, no one has an inherent right to engage in the liquor traffic, and second, he is free to accept or renounce the conditions by accepting or refusing the license. Having voluntarily accepted the license, he is no longer free to renounce the conditions.”
 

 Further, they say:
 

 “Going one step further, not only has no man an inherent right to sell intoxicating liquors, but he has neither property rights, contract rights, nor vested rights in his license, once obtained.
 

 “Actually, the only right a citizen has with reference to the sale by him of intoxicating liquors is his right to comply with the statute and to enforce compliance with the statute as against arbitrary administration of the statute by administrative bodies. In other words his sole right is the right to demand and retain such rights as are granted in the statute, upon a showing of non-compliance, or arbitrary abuse, on the part of the administering authority.”
 

 And in support of the arguments they cite and quote from numerous decisions (of this court and courts of other jurisdictions) including Crowley v. Christensen, 137 U.S. 86, 11 S.Ct. 13, 34 L.Ed. 620; City of New Orleans v. Smythe, 116 La. 685, 41 So. 33, 6 L.R.A.,N.S., 722, 114 Am.St.Rep. 566; State ex rel. Orleans Athletic Club v. Louisiana State Boxing Commission, supra, and State v. Morton, 182 La. 887, 162 So. 718. These cases are authority for the universally accepted propositions that there is no inherent right in a citizen to sell intoxicating liquor; that under the police power of the.state the liquor business may be entirely prohibited, or it may be regulated within the discretion of the governing authority under such conditions as will limit to the utmost the evils associated therewith; and that liquor licenses are neither contracts nor rights of property. But we do not understand them to hold, as appellants insist they do, that the granting of a privilege to engage in the liquor traffic can be made to depend on conditions which violate any and all constitutional guaranties. If such were the law there could never be an unconstitutional statute dealing with the liquor traffic. Certainly that was not the holding in Crowley v. Christensen, supra [137 U.S. 86, 11 S.Ct. 16], on which appellants principally rely, for the United States Supreme Court, regarding the liquor ordinance there under consideration, remarked: “ * * * The supreme court of the state has decided that the ordinance in question, under which the petitioner was arrested, and is held in custody, was thus authorized, and is valid. That decision is binding upon us unless some inhibition of the constitution or of a law of the United States'- is violated by
 
 *163
 
 it. We do not perceive that there is any such violation. * *
 
 *”
 

 Our appreciation of the law is that even though a state has the authority to grant or deny a privilege subject to conditions, which a person is free to accept or reject, its power in that respect is not unlimited. It may not through an abuse of.its police power impose conditions which require the relinquishment of constitutional rights. And this limitation applies to the liquor traffic, notwithstanding that the state has the right to suppress it entirely or may, in curbing the attendant evils, impose regulations on it more stringent than on other businesses. When the liquor traffic is lawful, as it now is, all regulations provided therefor must be pursuant to a legitimate exercise of the state’s police power, which includes the respecting of constitutional guaranties. Supporting this view is State ex reL. Galle v. City of New Orleans, 113 La. 371, 36 So. 999, 1002, 67 L.R.A. 70, 2 Ann.Cas. 92, in which this court said:
 

 “It is wholly immaterial, for the purposes of the question presented, that it has been held that the right to sell intoxicating liquors is • not inherent in a citizen of a state or of the United States (Crowley v. Christensen, 137 U.S. 86, 11 S.Ct. 13, 34 L.Ed. 620), and equally immaterial that in another state it
 
 has
 
 been held
 
 that
 
 such right is derived from the common law (Welsh v. Indiana [126 Ind. 71], 25 N.E. 883, 9 L.R.A. [664], 666), since in Louisiana it is a right conferred by the written law of the state, the enjoyment of which is subject to such conditions only as may be imposed or authorized by the General Assembly in the legitimate exercise of the police power of the state.
 

 “The police power of the state can, however, be exercised only in the enactment and enforcement of laws, and the lawmaking power is restricted within the limitations imposed by the Constitution of the United States and its own Constitution, and those which are said to be inherent in American institutions, and, like other governmental authority, is to be used for the common welfare — impartially and without arbitrary or unjust discrimination to the prejudice of private rights and individual liberty. * * *
 

 “ * * * A statute of this state imposing conditions upon the business of selling intoxicating liquors, though such conditions be more onerous than those imposed upon another business, may be sustained because the business of selling intoxicating liquors more seriously affects the health, morals, and general welfare of the public than another business; but where, as in this case, the state legalizes the business of selling liquors, and an individual citizen is denied the right to engage in it in a place and under conditions where and under which others having no better qualifications than he are so engaged, the law, if any there be, authorizing such denial, has no just founda: tion in reason or in the police power of the state, for it deprives one citizen of the
 
 *165
 
 right to earn his livelihood by means of a lawful calling, whilst according that right to others similarly situated, and, in so doing, deprives him of the equal protection of the law, and of his liberty, without due process of law, and oversteps those restrictions upon legislation which are said to be inherent in the nature of American institutions.”
 

 Since the petition of plaintiff herein specifically alleges a violation of the enumerated constitutional rights by the several statutory provisions attacked it states both a right and a cause of action.
 

 On the merits of the case appellants complain first of the district court’s ruling that Sections 1 (s), 24 and 26 (all relating to mandatory minimum mark ups) of Act 360 of 1948 are unconstitutional. These sections read:
 

 “Section 1. That the following terms, words and phrases, whenever used or referred to in this Act, unless a different meaning clearly appears from the context, shall mean: * * *
 

 “(s) ‘Cost’, invoice price to the dealer plus freight or cartage, if not included in the invoice, without any deduction for any discounts or concessions of any kind, plus all taxes, but not including sales tax and the emergency war tax of the United States of $3.00 per proof gallon, which became effective April 1, 1944.
 

 *
 
 % %
 
 * * * “Section 24. That Board shall adopt and promulgate rules and regulations to prevent any unfair practices in the sale of any ‘regulated beverages’ and to enforce the following minimum mark up by every dealer over his cost:
 

 “(a) The wholesaler’s minimum selling price to a retailer shall be his cost, as herein defined, plus 15% on liquor; 20% on cordial liquers and specialties; and 25% on sparkling and still wines.'
 

 “(b) The retailer’s minimum selling price shall be his cost, as herein defined, plus 33%% on liquor; 45% on cordials, liquers and specialties; and 50% on sparkling and still wines.
 

 “Provided, that the rules shall prescribe that no retailer shall expose any such beverages for sale without showing the selling price thereof in easily read figures, and it shall be unlawful for any retailer to ask or receive any other price for such beverages, except that the retailers shall add to said price, and collect from the purchaser, all sales taxes that may be due on each transaction.
 

 “Provided further, that where a wholesaler bottles wine in the State, there shall be added to his ‘cost’, the cost of bottles and supplies plus 10% of said total.
 

 “Provided, also, that no mandatory mark up shall be required when the transaction is between two wholesalers for resale at wholesale, or between two retailers, and that the cost for the minimum mark up on the resale in such transaction shall be the same cost as that of the original whole
 
 *167
 
 saler or retailer, as hereinbefore fixed; and provided further that the provisions of this section shall not apply to sales at wholesale made in the State for export beyond its borders.
 

 *
 
 *
 
 * * * *
 

 “Section 26. As a condition to the sale of any dealer’s product in the State, every manufacturer and every wholesaler shall file with the Board a detailed list of their selling prices, which may be supplemented or chánged from time to time, but not oftener than once in every thirty days, in such manner as the Board may prescribe. Said lists shall be posted by the Board and distributed to all licensed dealers within the State. No change in prices shall become effective until thirty days after the filing of notice thereof with the Board. Provided, that no discounts or rebates of any character or amount shall be given or received from list prices.”
 

 In its attack on these provisions plaintiff alleges that they violate
 

 (1) The due process clauses of the Fourteenth Amendment to the United States Constitution and Article I, Section 2 of the Louisiana Constitution;
 

 (2) Article II, Section 1 of the Louisiana Constitution, by delegating legislative authority to private persons;
 

 (3) The anti-monopoly clause of Article XIX, Section 14 of the Louisiana Constitution and the Sherman Anti-Trust Act [15 U.S.C.A. § 1 et seq.] ;
 

 (4)The equal protection clauses of the Fourteenth Amendment of the United States Constitution and Article I, Section 15 of the Louisiana Constitution.
 

 It is elementary that an act of the Legislature is presumed to be legal, and the judiciary is without right to declare it unconstitutional unless that is manifest. This rule is strictly observed in cases involving laws enacted in the exercise of the state’s police power. Further, under certain circumstances and when validly exercised the police power may encroach upon the due process guaranteed by the state and federal constitutions. Board of Barber Examiners of Louisiana v. Parker, 190 La. 214, 182 So. 485. Where, however, it clearly appears that there has been an abuse of the police power in the enactment of legislation, the court’s province and duty is to decree the offending portions of the statute invalid. State v. Legendre, 138 La. 154, 70 So. 70, 71, L.R.A.1916B, 1270.
 

 As a defense to appellee’s first ground of attack, which is that the mandatory minimum mark ups violate due process of law, appellants insist that the assailed provisions of the statute constitute a valid exercise of the state’s police power. To determine the correctness of this position it is necessary to consider the general nature of the state’s police power and to ascertain and to apply here the rule by which the validity of its exercise is tested.
 

 
 *169
 
 In 11 American Jurisprudence verbo Constitutional Law, Section 267, it is said: “Although constitutional guaranties cannot be transgressed, it is settled that the possession and enjoyment of all rights are subject to the police power which includes such reasonable conditions as may be deemed by the governing authority of the country essential to the safety, health, peace, good order, and morals of the community. Consequently, both persons and property are subjected to all kinds of restraints and burdens in order to secure the general comfort, health, welfare, and prosperity of the people of the state; everything contrary to public policy or inimical to the public interest is the subject of the exercise of the power. The return for the sacrifice of private rights, however, should be the attainment of some public object of sufficient necessity and importance justly to warrant the exertion of the power. Regulation to be valid must tend to some ulterior good to which the destruction or curtailment of rights is merely incidental. ij;
 
 f)
 

 The general rule for determining when there is a valid exercise of the police power is given in Sections 302 and 303 of 11 American Jurisprudence verbo Constitutional’Law as follows:
 

 “The fixed rule and basic standard by which the validity of all exercise of the police power is tested is that the police power of the state extends only to such measures as are reasonable, and that all police regulations must be reasonable under all circumstances. Too much significance cannot be given to the word ‘reasonable’ in considering the scope of the police power in a constitutional sense, for the test used to determine the constitutionality of the means employed by the legislature is to inquire whether the restrictions it imposes on rights secured to individuals by the Bill of Rights are unreasonable, and not whether it imposes any restrictions on such rights. It has been said that the only limitation upon the exercise of the police power is that such exercise must be reasonable. The validity of a police regulation therefore primarily depends on whether under all the existing circumstances the regulation is reasonable or arbitrary and
 
 whether it is really designed to accomplish a pzirpose properly falling zvithin the scope of the police pozver:
 

 "In every case it rmist appear that the means adopted are reasonably necessary cmd appropriate for the accomplishment of a legitimate object within the domain of the police power.
 
 A statute'to be within this power must also be reasonable in its operation upon the persons whom it affects, must not be for the annoyance of a particular class, and must not be unduly oppressive.
 

 “Section 303. Appropriateness of Means.
 
 —It is a general rule that in order for a police measure to be reasonablex the means adopted must be reasonably necessary and appropriate for the accomplishment of the
 
 
 *171
 

 legitimate objects falling within the scope of the power.
 
 In order to sustain legislative interference by virtue of the police power, either by a statute or a municipal ordinance, it is necessary that the act should have some reasonable relation to such objects, or, for more specific examples, to the public welfare or public health.
 
 Moreover, the law must tend toward the accomplishmient or promotion of such purposes in a degree that is perceptible and clear, either in preventing some offense or manifest evil or in furthering some such object.
 
 The means employed should not go beyond the necessities of the case.
 

 "The mere assertion by the legislature that a statute relates to the public health, safety, or welfare does not in itself bring that statute within the police power of a state, for there must always be an obvious and real connection between the actual provisions of a police regulation and its avowed purpose and the regulation adopted must be reasonably adapted to accomplish the end sought to be attained. A statute or ordinance which has no real, substantial, or rational relation to the public safety, Health, morals, or general welfare is a palpable invasion of rights secured by the fundamental law and cannot be sustained as a legitimate exercise of the police power. One application of the familiar rule that the validity of an act is to be determined by its practical operation and effect, and not by its title or declared purpose, is that a constitutional right cannot be abridged by legislation under the guise of police regulation. The exercise of the potver .must have a substantial basis and cannot be made a mere pretext for legislation that does not fall within it.
 
 The legislature has no power, under the guise of police regulations, arbitrarily to invade the personal rights and liberty of the individual citizen, to interfere with private business or impose unusual and unnecessary restrictions upon lawful occupations, or to invade property rights.” (Italics ours.)
 

 The rule finds support in our jurisprudence. In State v. Legendre, supra, this court held: “It is the duty of the courts to enforce the state’s police regulations enacted by the Legislature in good faith and with reasonable and appropriate regard for the protection which the state owes to the life, health, and property of her citizens. * * * The fourteenth amendment was not intended to hamper — or to authorize the courts to interfere with — the state’s exercise of its police power to regulate and promote the morals, health, and safety of her citizens. * * * The freedom of the right of citizens to make contracts is subject to such restrictions as the Legislature may impose, in good faith and with a reasonable and appropriate regard for the welfare of the citizens, in the exercise of the police power of the state. * * * But a statute containing a mere pretense of promoting or protecting public health or public safety, and having no real or
 
 *173
 
 reasonable relation to its pretended object, is an abuse of the police power of the state, and, in so far as it invades the fundamental rights of her citizens, it is the province and duty of the courts to adjudge such a subterfuge invalid, and to uphold the Constitution. * * * ”
 

 In State v. Blake, 170 La. 175, 127 So. 592, 597, we approved the following expressions contained in Lochner v. State of New York, 198 U.S. 45, 56, 25 S.Ct. 539, 49 L.Ed. 937, 941, 3 Ann.Cas. 1133: “It is a question of which of two powers or rights shall prevail, — the power of the state to legislate or the right of the individual to liberty of person and freedom of contract. The mere assertion that the subject relates, though but in a remote degree, to the public health, does not necessarily render the enactment valid. The act must have a more direct relation, as a means to an end, afnd the end itself must be appropriate and legitimate, before an act can he held to be valid which interferes with the general right of an individual to be free in his person and in his power to contract in relation to his own labor. * * * ”
 

 In City of Alexandria v. Hall, 171 La. 595, 131 So. 722, 724, the following language found in State ex rel. Newman v. City of Laramie, 40 Wyo. 74, 275 P. 106, was quoted approvingly:
 

 “
 
 ‘ “To justify the state in thus interposing its authority in behalf of the public, it must appear, first, that the interests of the public generally, as distinguished from those of a particular class, require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals. The Legislature may not, under the guise of protecting the public interests, arbitrarily interfere with private business, or impose unusual and unnecessary restrictions upon lawful occupations.”
 

 “ ‘The law must have a real or substantial relation to the public interest in the matter regulated. * * * And, while the courts repeatedly have said they should not decide as to the expediency of a measure; it has come to be settled by the high court whose decisions establish the rules limiting the exercise of the police power, that a court should and does determine whether, in its judgment, the law has a real or substantial relation to objects and purposes recognized as legitimate. *
 
 *
 
 * The claim that the -restriction in the law bears a reasonable relation to a public interest must- not rest bn mere conjecture, but must be supported by something of substance. * * *
 

 “ ‘Unless the closing regulation in question-in the case at bar bears a real and substantial relation to the purpose of protecting the public from the spread of disease, it stands on the same footing as any similar restriction on the right of a citizen to engage in a harmless and useful occupation.’ ”
 

 
 *175
 
 It was said by this court in Board of Barber Examiners of Louisiana v. Parker, supra, that [190 La. 214, 182 So. 505]: "The operation of a barber shop is a business affecting the public health, safety and welfare and laws and regulations enacted for the purpose of preserving them constitute a valid exercise of the police power of the State, provided such laws and regulations are not arbitrary, capricious and oppressive and that the means selected by the legislative body to carry them out shall have a real and substantial relation to the purpose sought to be obtained. * * * ”
 

 Greatly influencing our decision in Louisiana Wholesale Distributors Association v. Rosenzweig, 214 La. 1, 36 So.2d 403, as the opinion therein discloses, was the following language used by the United States Supreme Court in the leading case of Nebbia v. People of State of New York, 291 U.S. 502, 54 S.Ct. 505, 516, 78 L.Ed. 940, 89 A.L.R. 1469: “So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose. The courts are without authority either to declare such policy, or, when it is declared by the legislature, to override it. If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders a court functus officio. * * * Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty.”
 

 Returning to the position of appellants herein, it is indisputable that the liquor traffic can be regulated, even prohibited, by the valid exercise of the police power, the regulating thereof being essential to the general health, peace, good order, and morals of the people. Further, it must be observed that the announced object or purpose of Act 360 of 1948, is to regulate and control, under the police power, all traffic of alcoholic beverages containing more than six per centum of alcohol by volume. This is clearly stated in a preamble, immediately preceding the enacting clause, reading: "Whereas, it is deemed necessary for the protection of the safety, welfare, health, peace and morals of the people of the State that all traffic in alcoholic beverages containing more than six per centum of alcohol by volume be regulated and controlled, and that the police power of the State be exerted so that the said traffic may not cause injury to the economic, social and moral well-being of the people of the State, now therefore.”
 

 Now, in applying the above test, the following questions must be answered: Is.
 
 *177
 
 there a real and substantial relation between the mandatory minimum mark ups of the statute and the preventing of injury to the economic, social and moral well being of the people of the state? Are those means (the mark ups) reasonably necessary and appropriate for the accomplishment of the legitimate object or purpose which the statute announces (regulation and control of the traffic) ?
 

 Appellants, of course, answer these questions in the affirmative, they maintaining that the minimum mark ups are designed, in the interest of temperance, to protect the people from the temptations of cheap liquor due to cut-throat competition; to eliminate excessive consumption of strong drink that results from price wars; and to prevent certain moral abuses brought about by low liquor prices. Appellee, on the other hand, answers in the negative. It states, to quote from counsel’s brief, as follows: “Act 360, it is submitted, is aimed at the ordinary hazards of competition incident to any business; price competition and credit risks. It bears no real and substantial relation to the public welfare, but is preferential legislation for certain favored groups in the liquor industry.”
 

 As to whether the mark ups are reasonably needed to prevent cut throat competition and price wars (as appellants contend they are), there is no recitation in the statute revealing, a legislative finding that such a condition in the liquor traffic existed in Louisiana at the time of or within a few years prior to the enactment of the legislation. Neither does the evidence adduced on the trial of this case conclusively disclose the existence thereof; at the most it shows that several isolated price cutting incidents between certain individuals occurred many years before the adoption of the statute.
 

 However, the record does contain testimony of a Mr. Philip N. Spiller, a retail liquor dealer of San Antonio, Texas, to the effect, that in his city a price war was then in existence, it having commenced in May of 1947, whereby the retailers were selling liquor much below cost which, in his opinion, had operated to the detriment of the general welfare of the people. To support his opinion he testified further that since the war’s commencement the arrests there for drunkenness and drunken driving of motor vehicles had increased approximately ten per cent. This evidence, as we view it, has little value in determining the main question under consideration. In the first place such a price war can hardly occur in this state, for Act 338 of 1940, as last amended by Act 2S6 of 1946 (The Unfair Sales Act), the constitutionality of which was upheld in Louisiana Wholesale Distributors Association v. Rosenzweig, supra, eliminates unfair competition by prohibiting the sale, in the regular course of business, of any merchandise for a price less than cost. Furthermore, there is no way of tracing the asserted increase in the number of crimes, about which Spiller testified, di
 
 *179
 
 rectly to the price war; nor is it shown what percent of the mentioned arrests resulted in convictions.
 

 With further reference to the San Antonio situation, the witness Spiller also testified:
 

 “Q. How does your association propose to deal with this problem of price wars aside from eliminating advertising prices? A. The legislative committee asked the State legislature as an immediate relief the elimination of price advertisement in the newspapers and the elimination of the discount from wholesaler to retailer.
 

 “Q. You did not propose that there be fixed prices? A. No, sir..
 

 “Q.
 
 Mandatory mark ups ? A. No, sir.”
 

 But assuming for the sake of argument that liquor price wars are possible of occurrence in this state and that stringent regulations to prevent them are needed, we do not agree that the mandatory mark ups provided by Act 360 of 1948 constitute appropriate means for the achievement of that purpose. True, these are fixed percentages that the wholesale and retail dealers must add to their costs (the enforcement of the addition is charged to the Louisiana Board of Alcoholic Beverage Control), resulting usually in uniform prices on the affected beverages among the dealers of each class. (The percentages, incidentally and as shown by the record, are substantially the same as those used in the late OPA pricing formula; however, the OPA mark ups provided ceiling prices whereas the instant ones are employed in setting floor prices.) Nevertheless the statute omits the stipulation of a mandatory mark up for the manufacturer or distiller respecting his sales to the wholesaler, and, by reason of the omission, such producer (or producers) very easily might instigate and sustain the occasion of a price war. There is nothing in Act 360 of 1948, or otherwise to our knowledge, to prevent a distiller (or a combination of distillers) from placing his product on the market at mere cost plus tax (without profit) in competition with others who seek profits on their merchandise. If such is done, and it is possible to do, the purchasing wholesaler and his vendee, the retailer, need only add to their respective costs the required mark ups, and there could result the discussed cut throat competition and price war (with cheap liquor to the consumer) which the statute, appellants maintain, purposes to avoid.
 

 Again, it appears that the mandatory mark ups of the legislation do not affect beer; nor are they enforceable as against the sale of liquor at bars in individual drinks. As to the latter, Mr. Fred W. Scharfenstein, president of the Louisiana Retail Liquor Dealers Association, testified :
 

 “Q. Is
 
 there any mark up now prevailing on the amount that a bar must receive for a drink? A. No.
 

 
 *182
 
 “Q. The only type of sales affected by Act 360 is package good sales? A. Yes, sir.”
 

 And Mr. Thomas H. Schneidau, a member of the Louisiana Board of Alcoholic Beverage Control, gave similar testimony as follows:
 

 “Q. You say this liquor price fixing statute or Act 360 rather, has resulted in the elimination of prostitutes and B-girls in connection with the sale of liquor? A. To a certain extent; not largely, no.
 

 “Q. Do prostitutes and B-girls normally hang around package stores ? A. No.
 

 “Q. Is there anything in the law which regulates the price of drinks across the bar? A. No.
 

 “Q. Isn’t that the place where prostitutes and B-girls are usually found? A. To .a great extent, yes.
 

 “Q. You say you had a lot to do with the passage of the law? A. Correct.
 

 “Q. Was any attempt made to fix the price of resale drinks across the bar? A. To meet it would have'been a physical impossibility. You would have to determine what type of liquor was in the place and you have to be there when it is sold.”
 

 If then the statute does not control dealers of liquor “over the bar” and those engaged in selling beer, why could not those outlets indulge in the cutting of prices on intoxicants, at least to the minimum stipulated in our Unfair Sales Act,'to the great disadvantage of the retail dealers in package liquor, including the plaintiff herein? The question answers itself.
 

 From all of which we conclude that the provisions, of Act 360 of 1948 which relate to the mandatory minimum mark ups (Sections l.(s), 24 and 26) do not tend, in a degree that is perceptible and clear, toward the accomplishment of the announced purpose of the statute, namely the regulation and control of the liquor traffic so.that it “may not cause injury to the economic, social and moral well-being of the people of the State.” They, in other words, are inappropriate for the achievement of the legitimate object described in the statute. Accordingly, we hold that such provisions are manifestly unreasonable within the contemplation of the state’s police power, and, hence, are unconstitutional in that they violate the due process clauses of our state and federal constitutions.
 

 It is' to be clearly understood that we are not holding that the Legislature cannot under any circumstances adopt legislation, pursuant to the state’s police power, relating to the establishing of prices on intoxicants with the view and purpose of regulating the liquor traffic and protecting the general welfare of the people. That broad question is not presented by this case; here we are concerned only with specific mandatory mark up provisions of a particular statute, with respect to the enactment of which the police power was not validly exercised. Neither are we
 
 *183
 
 passing upon the constitutionality of any other provisions of Act 360 of 1948, that being unnecessary for the purpose of this decision. Plaintiff is charged only with a violation of the statutory mark up requirement ; and the issue decided by the district court respecting the procedure before the Louisiana Board of Alcoholic Beverage Control has since become moot.
 

 Finally, it is well to state that careful consideration has been given to the numerous authorities cited by appellants’ counsel, and that we find them uncontrolling here because of their being either inapplicable or distinguishable factually. To discuss briefly a few of those principally relied on, the case of Nebbia v. People of State of New York, supra, involved an emergency statute which empowered an administrative 'board, after hearings, to establish minimum and maximum prices for the sale of milk. The legislation was enacted in the interest of health and sanitation, its purpose being to prevent ruthless competition from destroying the wholesale price structure, on which the farmer depends for his livelihood, and thus to assure for the people generally an adequate supply of milk. For the accomplishment of that legitimate object the means adopted clearly were reasonably necessary and appropriate. In Board of Barber Examiners • of Louisiana v. Parker, supra, a law authorizing the fixing of minimum barber prices by a state agency, after investigations and on the recommendation of at least 75% of the barbers of a district, was correctly held to relate to sanitation and health and to constitute a valid exercise of the police power. Pepsodent Company v. Krauss Company, Ltd., 200 La. 959, 9 So.2d 303, concerned a statute known as the Louisiana Fair Trade Act which, unlike the one here, gives recognition to what is termed a fair trade contract and serves to protect trade-mark owners and the public against injurious practices in the distribution of commodities. Louisiana Wholesale Distributors Association v. Rosenzweig, supra, involved a statute (Unfair Sales Act) which affords protection to the public against the creation or perpetuation of monopolies and it encourages competition by prohibiting unfair sales and discriminatory practices. Reeves et al. v. Simons (Ky. Court of Appeal), 289 Ky. 793, 160 S.W.2d 149, is likewise distinguishable for several reasons, two of these being that the liquor statute there in question requires all sales to be made in accordance with a fair trade contract, and it stipulates for the distiller or manufacturer of liquor a mandatory minimum mark up. The only question presented in United States v. Frankfort Distilleries, 324 U.S. 293, 65 S.Ct. 661, 89 L.Ed. 951, was whether the United States had the right to prosecute the defendant (it having been charged with a liquor violation under the Sherman AntiTrust Law), since the Twenty-First Amendment to the Federal
 
 Constitution
 
 had given to the several states control over liquor. The case did not concern legislation relating to the establishing of prices.
 

 
 *185
 
 For the reasons assigned the judgment appealed from is affirmed.
 

 FRUGE, J., dissents.