

# THE ATTORNEY GENERAL

## OF TEXAS

### AUSTIN 11, TEXAS

WILL WILSON
ATTORNEY GENERAL

April 24, 1959

Honorable Reagan R. Huffman, Chairman     Opinion No. WW-609
Liquor Regulations Committee
House of Representatives               Re:   Constitutionality of
Austin, Texas                            House Bill 353, 56th Legisla-
                                        ture, relating to establish-
                                        ment of minimum sales price in
                                        the sale of spiritous liquors.

Dear Sir:

           Your request of March 25, 1959 reads as follows:

           "Please consider this letter as a request from
the House of Representatives Liquor Regulation Com-
mittee for a Constitutional Opinion on the enclosed
House Bill 353 by Representative Day.

           "By unanimous vote of the above Committee this
Bill has been sent to you for your opinion as to
its constitutionality. This Committee would also
humbly request your opinion as to whether this Bill
would be constitutional if amended to state that no
retail liquor dealer could sell under wholesale
prices."

           We will turn our consideration to your first question, namely,
whether the Bill as written is constitutional.

           Article 666-57 of Section 1, H. B. 353, reads as follows:

           "<u>ARTICLE 666-57 - POLICY OF THE STATE</u>: It is
hereby declared to be the policy of the State of
Texas to stabilize liquor prices for the purpose of
stabilizing public revenues and an end of avoiding
price wars which would materially affect the re-
venues of the State, attempts at monopolies and the
demoralization of the legally controlled sales of
liquors in this State which grows out of unfair price
manipulations."

           The following quotations are taken from House Bill 353 as pertain-
ing to the setting of a minimum price:

"ARTICLE 666-58 - SALE AND IMPROPER PRICES PRO-HIBITED: No wholesaler or retailer of spiritous or vinous liquors as they are defined in Article 666-3A of this chapter, shall sell any such liquors in this State, except at the prices herein fixed.

"ARTICLE 666-59 - THE WHOLESALER'S SELLING PRICE: The wholesaler's selling price to the retailer shall be his cost as defined in this Act, plus a minimum mark-up of 13% of cost on liquor, cordials, liqueurs, specialties, sparkling and still wines, and he shall deliver such liquors to the retailers at such price without additional price for delivery.

"ARTICLE 666-60 - RETAILER'S SELLING PRICE: The retailer's selling price shall be his cost as defined in this Act, plus a minimum mark-up of 30% of cost on liquors, cordials, liqueurs and specialties, and 50% on all wines.

'ARTICLE 666-61 - WHOLESALER'S COST DEFINED: The cost to the wholesaler is the actual invoiced price which he pays for the merchandise, and as determined by the Board's Administrator, plus State and Federal taxes, plus actual freight and cartage cost incurred in delivery to him.

"ARTICLE 666-62 - RETAILER'S COST DEFINED: The cost to the retailer is the actual invoiced price which he pays to the wholesaler.

"ARTICLE 666-63 - SELLING PRICE DISPLAYED BY RE-TAILER - DISCOUNTS: No retailer shall expose any of such alcoholic beverages for sale without showing the selling price thereof in easily read figures, and it shall be unlawful for any retailer to offer such merchandise for sale at any other figure, except that, in case lots (of not less than 2.40 gallon) the retailer may grant a discount of not more than 10% of such retail prices.

"ARTICLE 666-6A - SALES AT REDUCED PRICES: Wholesalers and retailers may make close-out sale or sales of damaged goods at reduced prices under such regulations as the Board's Administrator shall prescribe.

"ARTICLE 666-65 - REBATES, LOANS, OR GIFTS - AC-

CESS TO BOOKS AND RECORDS: Any rebates, loans, gifts or other special inducements offered, given, or accepted by either wholesaler or retailer, shall be considered evasions of the requirements of this Act, and the Board's Administrator and his agents shall have full access to all of the books and re- cords of wholesalers and retailers and common car- riers at all times for the purpose of detecting and proving such evasions."

Under the Texas Liquor Control Act, Article 666-41, Vernon's Annotated Penal Code, these provisions are to be enforced by both civil and criminal sanctions.

Section 19 of Article 1 of the Texas Constitution reads:

"No citizen of this State shall be deprived of life, liberty, property, privileges, or immunities, or in any manner disfranchised, except by the due course of the law of the land."

Due process of law not only includes procedural protection, but also substantive protection. It is a direct constitutional restraint upon the substance of legislation and means that a legislative curtailment of personal or property rights must be justified by a resultant benefit to the public welfare. Thus the due process guaranty does not restrain the State in the exercise of its legitimate police powers. See City of New Braunfels v. Waldschmit, 109 T. 302, 207 S. W. 303 (1918). Houston & Tex. Cent. Ry. Co. v. Dallas, 98 T. 396, 84 S.W. 648 (1905). Both liberty and property are subject to the exercise of these powers.

Nevertheless, the exercise of the police powers is not unrestrict- ed, but is limited to enactments having reference to the public health, comfort, safety and welfare. It must not be arbitrary, unreasonable, or patently beyond the necessities of the case, and the means which it employs must have a real and substantial relation to the object sought to be at- tained. See Spann v. City of Dallas, 111 T. 350, 235 S.W. 513 (1921), Houston & T. C. Ry. Co. v. City of Dallas, supra; American Federation of Labor v. Mann, Civ. App., 188 S.W.2d 276 (1945).

The Federal Constitution, in the fifth and fourteenth amendments, also provides against deprivation of life, liberty or property without due process of law, the fourteenth amendment by its language being applicable to prevent the states from carrying out such a deprivation. It has been held by Texas Courts that the clause of the Texas Constitution, to the extent that it is identical with the fourteenth amendment, has placed upon the powers of the state legislature the same restrictions as those which have been held to be imposed by the language of that amendment of the Federal Constitution. Mellinger v. City of Houston, 68 T. 37, 3 S.W. 249 (1887).

In Neel v. Texas Liquor Control Board, 259 S.W.2d 312 (Civ.App. 1953), the Court announced these guides as to the validity of regulations under the state's police power.

> "'The police power of the state extends only to such measures as are reasonable, and the general rule is that all police regulations must be reasonable under all circumstances.  In every case it must appear that the means adopted are reasonably necessary and appropriate for the accomplishment of a legitimate object falling within the domain of the police power.  A statute to be within this power must be reasonable in its operation upon the persons whom it affects and not unduly oppressive.  The validity of a police regulation therefore primarily depends on whether under all the existing circumstances the regulation is reasonable or arbitrary and whether it is really designed to accomplish a purpose properly falling within the scope of the police power.' 6 R.C.L., Constitutional Law, Paragraph 226.

> "We take the following from the case of Houston & T. C. R. Co. v. Dallas, 98 Tex. 396, 84 S.W 648, 653, 70 L.R.A. 850: 'The power is not an arbitrary one, but has its limitations.  It is commensurate with, but does not exceed, the duty to provide for the real needs of the people in their health, safety, comfort, and convenience as consistently as may be with private property rights.  As those needs are extensive, various, and indefinite, the power to deal with them is likewise broad, indefinite, and impracticable of precise definition or limitation'.

> "It has been further stated:  'In order to sustain legislative interference by virtue of the police power, under either a statute or a minicipal ordinance, it is necessary that the act should have some reasonable relation to the subjects included in such power, and the law must tend, in a degree that is preceptible and clear, toward the preservation of the public welfare, or toward the prevention of some offense or manifest evil, or to the furtherance of some object within the scope of the police power. * * *'  6 R.C.L., Constitutional Law, Paragraph 227."

In Attorney General Opinion O-3242 these principles were applied to hold fixed minimum prices for barber services unconstitutional because "first, there was not a discernable, substantial and legitimate relation between the means adopted by the bill and the legitimate object of the exercise of the police power, to wit, the protection or the improvement of the public health, safety, morals, or general welfare."

In Schwegmann Brothers v. Louisiana Board of Alcoholic Beverage Control, 216 La. 148, 43 So. 2d 248, 14 A.L.R. 2d 680 (La. Sup. 1949), the Louisiana Supreme Court had before it a very similar statute which reads in part as follows:

"(s) 'Cost', invoice price to dealer plus freight or cartage, if not included in the invoice, without any deduction for any discounts or concessions of any kind, plus all taxes . . .

"Section 24 . . . .

"(a) The wholesaler's minimum selling price to a retailer shall be his cost, as herein defined, plus 15% on liquor; 20% on cordial liquers. and specialties; and 15% on sparkling and still wines.

"(b) The retailer's minimum selling price shall be his cost, as herein defined, plus 33 1/3% on liquor, 45% on cordials, liquers and specialties; and 50% on sparkling and still wines."

In applying the principles announced in the Neel case, supra, the Louisiana Supreme Court in the Schwegmann Brothers case at page 258 had this to say:

"Now, in applying the above test, the following questions must be answered:  Is there a real and substantial relation between the mandatory minimum mark ups of the statute and the preventing of injury to the economic, social and moral well being of the people of the state?  Are those means (the mark ups) reasonably necessary and appropriate for the accomplishment of the legitimate object or purpose which the statute announces (regulation and control of the traffic)?

"Appellants, of course, answer these questions in the affirmative, they maintain that the minimum mark ups are designed, in the interest of temperance, to protect the people from the temptations of cheap liquor due to cut-throat competition; to eliminate excessive consumption of strong drink that results from price wars; and to prevent certain moral abuses brought about by low liquor prices.  Appellee, on the other hand, answers in the negative.  It states, to quote from counsel's brief, as follows:  'Act 360, it is submitted, is aimed at the ordinary hazards of competition incident to any business; price competition and credit risks.  It bears no real and substantial relation to the public welfare,

but is preferential legislation for certain favor-
ed groups in the liquor industry.'

            ". . .

    "But assuming for the sake of argument that
liquor price wars are possible of occurrence in
this state and that stringent regulations to pre-
vent them are needed, we do not agree that the
mandatory mark ups provided by Act 360 of 1948 con-
stitute appropriate means for the achievement of
that purpose.  True, these are fixed percentages
that the wholesale and retail dealers must add to
their costs (the enforcement of the addition is
charged to the Louisiana Board of Alcoholic Beve-
rage Control) resulting usually in uniform
prices on the effected beverages among the dealers
of each class . . . . Nevertheless the statute omits
the stipulation of a mandatory mark up for the
manufacturer or distiller respecting his sales to
the wholesaler, and, by reason of the omission, such
producer (or producers) very easily might instigate
and sustain the occasion of a price war.  There is
nothing in Act 360 of 1948, or otherwise to our
knowledge, to prevent a distiller (or a combination
of distillers) from placing his product on the
market at mere cost plus tax (without profit) in
competition with others who seek profits on their mer-
chandise.  If such is done, and it is possible to do,
the purchasing wholesaler and his vendee, the retailer,
need only add to their respective costs the required
mark ups, and there could result the discussed cut
throat competition and price war (with cheap liquor
to the consumer) which the statute, appellants maintain,
purposes to avoid.

            ". . .

    "From all of which we conclude that the provi-
sions of Act 360 of 1948 which relate to the mandatory
minimum mark ups (Sections 1(s), 24 and 26) do not
tend, in a degree that is perceptible and clear, to-
ward the accomplishment of the announced purpose of
the statute, namely the regulation and control of
the liquor traffic so that it 'may not cause injury
to the economic, social and moral well-being of the
people of the State.'  They, in other words, are
inappropriate for the achievement of the legitimate
object described in the statute.  Accordingly, we
hold that such provisions are manifestly unreasonable

within the contemplation of the state's police power,
and, hence, are unconstitutional in that they violate
the due process clauses of our state and federal
constitutions."

Article 666-2 of the Texas Liquor Control Act contains the
object and purposes for which the Act was passed. This Section reads as
follows:

"This entire Act shall be deemed an exercise of
the police power of the state for the protection of
the welfare, health, peace, temperance, and safety of
the people of the state, and all its provisions shall
be liberally construed for the accomplishment of that
purpose".

Now, in looking at the announced objects of House Bill 353 as
contained in Article 666-7, as above set out, we find the announced objects
to be:

(1) To stabilize liquor prices for the purpose of stabilizing
public revenues;

(2) Avoiding price wars which materially affect revenues;

(3) Attempts at monopolies and demoralization of legally con-
trolled sales of liquors which grow out of unfair price manipulations.

As above noted the liquor field is regulated under the state's
police power. Therefore, the question presents itself as to whether H. B.
353 is a ligitimate exercise of this power. As was stated in the Neel
case, supra, it must appear that the means adopted are reasonably neces-
sary and appropriate for the accomplishment of a ligitimate object falling
within the domain of the police power.

As to whether the police power can be used to stabilize public
revenues and avoid price wars which would materially affect the revenues,
the following principles would seem important. The police power cannot be
used for the purpose alone of raising revenue. 9 Tex. Jur. p. 513. While
the police power is exercised only for the purpose of promoting the public
welfare, and, although this end may be attained by taxing or licensing
occupations, the object must always be regulation and not the raising of
revenue. 16 C.J.S., p. 891. Insofar as the announced objects or purposes
of H. B. 353 are directed at stabilizing revenues, it would be the use of
the police power for the purposes and objectives which do not lie within
such power and would therefore be an unwarranted use thereof. With regard
to the announced objects or purposes of "avoiding price wars" and "attempts
at monopolies and demoralization of the legally controlled sales of li-
quors in this State which grow out of unfair price manipulations", we find

that the means of requiring a minimum percentage mark up at the wholesale and retail level as adopted by H. B. 353 has no discernible, substantial, and logical relation to the legitimate objects of the exercise of the police power, to wit, the protection or improvement of the public welfare, health, peace, temperance and safety. Since the bill omits the manufacturer or distiller from price regulation, such manufacturers or distillers are pro-vided the power to easily instigate or sustain the occasion of a price war, which by reason of the wholesalers and retailers being required to have a minimum mark up would be carried directly to the public (see discussion taken from Schwegmann Brothers case, supra, page 6 of this opinion). All adjustment of prices through competition would thus be thwarted.

The conclusion necessarily follows then that H. B. 353 does not meet the required test for a valid exercise of the police power since, as above pointed out, the means adopted are not reasonably necessary and ap-propriate for accomplishment of a legitimate object falling within the domain of the police powers.

It should be pointed out that H. B. 353 does not include all the elements of legislation popularly known as "Fair Trade" acts and that this opinion does not rule on the constitutionality of any other such legislation.

As to those portions of H. B. 353 which do not apply to a minimum mark up requirement, namely, maximum number of licenses; locations within five mile limits; cancellation of unused licenses; renewal of permits; and location on same streets; we find no authority holding that such regulations are an unreasonable regulation under the police power.

We turn now to your second question in which you ask our opinion as to "whether this bill (H.B. 353) would be constitutional if amended to state that no retail liquor dealer could sell under wholesale prices".

We cannot pass on the constitutionality of a provision which has not yet been drafted and presented to us for examination.

SUMMARY

The provisions of H.B. 353 that
pertain to the establishment
and enforcement of a minimum
sales price of spiritous liquors
for wholesalers and retailers
are not a valid exercise of the
police power. The provisions
regulating maximum number of li-
censes; locations within five
mile limits; cancellation of

unused licenses; renewal of per-
mits; location on same streets;
are constitutional.

Very truly yours,

WILL WILSON
Attorney General

By: Jot Hodges, Jr.
Assistant

JH:aw

APPROVED:

OPINION COMMITTEE:

Geo. P. Blackburn, Chairman

C. K. Richards
C. Dean Davis
Elmer McVey
Paul W. Floyd, Jr.

REVIEWED FOR THE ATTORNEY GENERAL
BY:
    W. V. Geppert