Dear Mr. Morvant:
We issued Attorney General Opinion No. 02-0258 to the Honorable Gerald "Buzz" Breaux, President of the Lafourche Parish Council, concerning what the effect of lack of publication had on ordinances adopted under the Lafourche Parish Home Rule Charter, which has very specific publication and notice requirements in the procedures for adopting an ordinance. In that opinion, we suggested that the ordinances which had deficient publication be re-introduced and ratified in accordance with the Home Rule Charter procedures.
After we released the Opinion No. 02-0258, you began an examination of all Lafourche Parish ordinances adopted since January 2000 and stated some of your interim findings as follows:
 "1. For the year 2000-of the 113 ordinances adopted, publications dealing with 72 of those ordinances were deficient. Deficiencies mainly consisted of a failure to publish public hearing notices. Also, in some cases, the either the introduction publication or the adoption publication were only published within published minutes.
 "2. For the year 2001-of the 103 ordinances adopted, all publications were deficient. Deficiencies for this year were mainly due to the fact that the ordinances were published, most cases more than fourteen days after introduction, in caption form in public hearing notices. Also, in many instances, the public hearings were held within either less than 5 days or more than 14 days from the date of publication, contrary to the requirements of Lafourche Parish's Home Rule Charter (relevant excerpts enclosed). As in the year 2000, some of the introduction or adoption publications were included within published minutes."
You say that you are worried about the costs of re-publication and the limitation contained in La.R.S. 33:4873(1). You also have eight specific questions, and after you sent your opinion request to us, your assistant sent us a letter requesting that we answer how R.S. 42:9 from the "Open Meetings Law" would possibly apply to this situation since Lafourche Parish is a Home Rule Charter parish.
The people of Lafourche Parish have apparently taken advantage of La. Const. (1974) art. 6, § 5, and adopted a "Home Rule Charter" by ratification at a public referendum on August 14, 1976 and by subsequent ratification of amendments. That charter reads, in pertinent part:
"SECTION B. ENACTMENT OF AN ORDINANCE
 "1. Exclusive Method of Enactment. Except as provided in Sub-section 10 hereof, an ordinance shall be enacted only in the manner provided in this section. Unless otherwise specified herein, only members shall have the right to propose ordinances.
* * *
 "3. Introduction, Form and Title. Each ordinance shall be introduced at a public meeting of the governing authority in typewritten or printed form and shall have a title indicating its subject or subjects. Each ordinance shall be confined to the subjects expressed in its title.
 "4. Initial Publication. Each proposed ordinance shall be published in the official journal of the Parish within fourteen (14) days after introduction.
"5. Public Hearings.
 "a. General Requirements. There shall be a general public hearing for every proposed ordinance. The date, time, and place of the public hearing or hearings shall be published in the official journal of the parish not less than five nor more than fourteen days prior to such hearing or hearings. At any such public hearing any resident of the parish shall have a right to speak on the proposed ordinance.
 "b. Regional Hearing. If requested in writing by at least one-half percent of the qualified voters of any region in the Parish, the governing authority shall hold a regional public hearing on the proposed ordinance in that region. For the purpose of this subsection, three (3) regions shall be established by the governing authority to include the entire parish and shall be the North, Central, and South Lafourche regions. A regional public hearing shall be conducted by the members of the governing authority from the region. It shall not be necessary to hold a regional public hearing in the region where the general public hearing is held."
 "6. Amendment. A proposed ordinance shall not be altered or amended during consideration to nullify its original purpose or to accomplish an object not consistent with its original purpose.
 "7. Enactment. An ordinance shall be enacted at a public meeting when voted upon favorably by at least a majority of the members of the governing authority; except that an ordinance to increase a tax, service charge, occupational license fee, or special fee shall only be enacted when voted upon favorably by at least two-thirds of the members of the governing authority. Any resident of the Parish shall have a right to speak on the proposed ordinance.
 "8. Final Publication. After an ordinance has been enacted, it shall be published in the official journal of the Parish.
 "9. Effective Date. An ordinance shall become effective on the tenth day after final publication, unless a later date is provided therein. In no event shall an ordinance become effective within ten (10) days after final publication.
* * *"
Lafourche Parish Home Rule Charter, Art. IV, § B(1), (3), (4), (5), (6), (7), (8), and (9). Sub-section 10 of this Section of Art. IV of the Lafourche Parish Home Rule Charter excepts from these particular rules emergency or budget ordinances and ordinances adopted by initiative or referendum; this opinion does not deal with these kinds of ordinances.
By these provisions, the people themselves of Lafourche Parish have obligated the Lafourche Parish Council to make certain publications so as to give the people of the parish notice of the intent to adopt any ordinance, notice of the full and exact contents of the ordinance as introduced, notice of the date, time, and place of each public hearing when any interested citizen can be heard on the ordinance, and notice or promulgation of the ordinance as finally adopted before it can be enforced. The Lafourche Parish Home Rule Charter has made such notices asine qua non for the valid adoption and enforcement of any ordinance. Accordingly, we think that at the least "substantial compliance" with these provisions is necessary for an ordinance to be validly adopted and enforceable.
By the term substantial compliance, we mean that these Home Rule Charter provisions have "been followed sufficiently so as to carry out the intent for which [they were] adopted," Dorignac v. La. Racing Comm.,436 So.2d 667, 669 (La.App. 4th Cir. 1983). "What constitutes substantial compliance with a statute [or a Home Rule Charter provision] is a matter depending on the facts of each particular case," id. See also Attorney General Opinion No. 90-226A, a copy of which is enclosed. By analogy to the Louisiana Administrative Act for the adoption of executive agency rules, these Home Rule Charter publication and hearing requirements are "safeguards," Attorney General Opinion No. 90-226A, page 2, designed to "restrain arbitrary, capricious or abusive exercises of power," id., by the Lafourche Parish Council and to preserve the "public participation traditionally observed in the lawmaking process of the legislative branch of government," id. In summary, "notice" and "opportunity to be heard" have always been fundamental to both fairness in judicial and certain executive agency proceedings and participatory democracy in legislative proceedings.
We will now attempt to apply these principles to your specific questions:
1. For ordinances that were properly published, but had no public hearing notices published, what would be the most economical remedy?
With the caveat that we write legal opinions and not economical or budgetary opinions, which are outside of our function, it is our legal opinion that publication of a hearing notice and the conduct of a public hearing in accordance with such notice before ratification or adoption of the ordinance and then promulgation publication after ratification or adoption would probably suffice. There seems to be no required delay within which a proposed ordinance, after original publication, must be heard or adopted.
It is difficult to refer to the procedure as a "ratification" because it is always possible that after the new public hearing held in accordance with its notice and after some citizens speak and are heard on the matter, the Lafourche Parish Council may not adopt the ordinance in exactly the same form but may modify it to accommodate the residents' comments and concerns. Hence, it could simply be a new adoption.
2. For ordinances that were not published in full after introduction and/or were not published within 14 days after introduction as provided by the Lafourche Parish Home Rule Charter (HRC) Art. IV, § B(4), what would be the most economical remedy?
Again, with the caveat that we write legal opinions and not economical or budgetary opinions, which are outside of our function, it is our legal opinion that you should re-introduce the ordinance as a proposed ordinance, make the introduction publication within 14 days, and complete the entire process as HRC Art. IV specifically requires.
We cannot say that a court might not hold in a future case that a publication of a proposed ordinance in full some fifteen or sixteen days after introduction nevertheless constitutes substantial compliance with the HRC Art. IV, § B(4), provisions, because the purpose of the fourteen day delay is to cause the interested residents who look for and read the parish's official journal to learn what the ordinance contains, at a time that the subject matter of the newly introduced ordinance is still of interest and at a time that the people are expecting to see it in the official journal soon after introduction. Waiting several months, however, would be too long because those with an interest in the subject matter of the ordinance would not expect it to be published at this time and might miss learning of what details the proposed ordinance contains. In any event, we urge the parish council to follow the letter of the law — viz., the HRC provisions, including HRC Art. IV, § B(4), which sets a fourteen day limit — if you are attempting to correct past deficiencies in the adoption process, because HRC Art. IV, § B(1), is quite specific about these provisions setting forth the exclusive method by which an ordinance may be adopted and because the council wants to be sure that it has properly corrected the deficiencies.
3. For ordinances that had public hearing notices published but said public hearings were either not held within not less than five nor more than 14 days of publication, or for ordinances not adopted at the advertised public hearing but were adopted at a later date, what would be the most economical remedy?
Still again, we retain the caveat that we write legal opinions and not economical or budgetary opinions, which are outside of our function. To answer this question legally, more information is needed. It does not seem to be a violation of the HRC to advertise notice of a public hearing and then to call off the public hearing; indeed, given the weather conditions and other contingencies that prevail during certain times of the year, it may be necessary to do so. The question must be whether the adoption of the ordinance was preceded by a public hearing conducted in accordance with five-to-14 days' advanced notice.
It is our opinion that the adoption of the ordinance does not have to take place at the public hearing on the ordinance. Indeed, the HRC provides that sometimes there will be a series of regional hearings on the ordinance. We think substantial compliance with the HRC provisions occurs when there is a public hearing conducted in accordance with five-to-14 days' advanced notice, the council hears the citizens' comments and concerns, mulls over these comments and concerns, and then, at a later public meeting, decides to amend or not amend the ordinance accordingly and then adopts the amended or unamended ordinance. In our opinion, "public meeting" is not necessarily synonymous with "public hearing," although the council can have a "public hearing" near the same time as (such as immediately preceding) or even within a "public meeting."
4. Are introduction publications or adoption publications included as part of a publication of minutes valid?
It is our legal opinion that they validly serve to meet publication requirements, as long as the ordinances or proposed ordinances appear in their full contents. We believe "substantial compliance" with the HRC's introduction or promulgation publication requirements occurs when the ordinance or proposed ordinance, properly identified as such, is set forth in full in the parish journal for the residents of the parish to read and learn of the details of the contents thereof. The fact that the full content of the ordinance or proposed ordinance appears within the minutes of the council does not, in our opinion, detract from the purpose for which the HRC requires publication of same — viz., to inform the residents of the parish of the details of the ordinance or proposed ordinance in a timely manner. Indeed, within the minutes, the ordinance or proposed ordinance would certainly seem to be appropriately identified to be what it is.
5. Depending on the deficiency of publication, can some of the ordinances be re-introduced, re-ratified and published in globo? Do the ordinances that were published in full but did not have public hearing notices published have to be re-published in full or would a publication in caption form suffice?
We are not certain what you mean by in globo. The parish council can re-introduce (or introduce) as many ordinances at one time as it can handle. The important factors are to set them forth in their entirety in accordance with HRC Art. IV, § B(4), so the readers in the parish can see the whole ordinance, then later to hold a public hearing on the ordinances conducted in accordance with the time, date, and place notice published in the official journal in accordance with HRC Art. IV, § B(5), so that the readers can know when and where to show up to speak their concerns, and then finally, after adopting some version of the ordinances, to publish them fully again as finally adopted in accordance with HRC Art. IV, § B(8), so that the readers in the parish will know precisely in what forms the finally adopted ordinances are and know what the law is and what they have to obey.
We think we answered, in response to question number 1 above, the second question concerning ordinances that were published in full but did not have public hearing notices published. In our opinion, publication of a hearing notice and the conduct of a public hearing in accordance with such notice before ratification or adoption of the ordinance and then promulgation publication after ratification or adoption should suffice. It is our opinion that the proposed ordinance does not have to be published in full in the publication of only the public hearing notice; rather, simple identification of the ordinance(s) (which can properly be identified by title [see HRC Art. IV, § B(3)]) suffices so that the readers will know what ordinance(s) and their subject matter(s) the public hearing is for.
6. Does La.R.S. 33:4873(1) apply to a parish operating under a Home Rule Charter?
It is our opinion that La.R.S. 33:4873(1) does not limit the amount of money that can be spent on publication of legal notices of public hearings on ordinances or publication of proposed or finally adopted ordinances, all publications made in compliance with HRC Art. IV, § B. First of all, in the parish budget, funds should be specifically allocated for this purpose, and the statute applies only to funds not otherwise specifically allocated. In addition, we think the statute applies only to a parish's advertising of itself, such as in travel or local government magazines, convention booklets, or radio broadcasts, and not to publication, in the official journal of the parish, of legal notices going to the internal method of the governmental enactment of its own laws and ordinances. The statute merely clarifies that, within the limits of monies set forth therein, a parish or municipality has the authority to pay for advertisements of itself; without the statute, such challenges to and arguments against the power and authority to make advertisements as had been made, for example, in Wilkinson v. Poag,181 So. 27 (La.App. 2nd Cir. 1938), and also in a series of attorney general opinions down through the years, would continue indefinitely. Also, as explained later in this opinion, infra, there are serious jurisprudential problems with trying to apply the spending limitations of this statute to a parish operating under a Home Rule Charter.
7. Would legal application of ordinances that were deficiently published and corrected be retroactive to when the ordinances were originally adopted and published after enactment or would legal application occur only after they were correctly published, adopted and enacted?
It is our opinion that the publication requirements of HRC Art. IV, § B, have to be substantially complied with; otherwise, the purported ordinance is actually null and void and unenforceable. For practical guidance, however, be aware that there are general presumptions in the law that governmental officers perform their duties in accordance with law and that statutes and ordinances are valid. Nevertheless, in our opinion, anyone challenging an improperly enacted statute or ordinance will succeed in a court of law and cause the court to declare the statute or ordinance null and void and unenforceable. We feel that it is better not to rely on the general presumption but rather to correct the deficiencies and to begin to enforce the ordinance in accordance with HRC Art. IV, § B(9), only after it has been properly enacted and promulgated in accordance with HRC Art. IV, § B.
8. In situations where the ordinances were not furnished to the official journal within 10 days of the proceedings at which they were introduced or adopted, as provided by La.R.S. 43:144, would publication of these ordinances be categorized as deficient so as to warrant re-publication?
La.R.S. 43:144 appears to be only a criminal statute providing penalties when an official whose duties include preparing and delivering a copy of the official proceedings for publication "wilfully" neglects or fails to send same to the official journal within 10 days. The official of the Lafourche Parish Council responsible for preparing and sending the copy of the official proceedings (including ordinances and notices) to the official journal of the parish should comply with La.R.S. 43:144. However, although the operation of this statute, as a practical matter, is coincidentally supportive of HRC Art. IV, § B, it really is independent of and separate and apart from the HRC provisions. It is the HRC provisions which must be complied with for the ordinance to be properly adopted. Thus, even if the responsible official delivered a copy of a proposed ordinance on the eleventh day after introduction, if the official journal published it in full before the fourteenth day after introduction, HRC Art. IV, § B(4), for example, would be complied with.
In a separate, second letter following your first letter requesting this opinion, your assistant requests that we address the applicability of La.R.S. 42:9 and the "Open Meetings Law" La.R.S. 42:4.1 through 13) to this situation, particularly in light of the fact that Lafourche Parish operates under a Home Rule Charter.
La. Const. (1974) art. 6, § 6, reads:
 "The legislature shall enact no law the effect of which changes or affects the structure and organization or the particular distribution and redistribution of the powers and functions of any local governmental subdivision which operates under a home rule charter."
However, La. Const. (1974) art. 6, § 9(B), reads:
 "Notwithstanding any provision of this Article [article 6], the police power of the state shall never be abridged."
In light of this constitutional tension between the local autonomy of parish and municipal governments operating under Home Rule Charters and the police power of the state exercised by state legislation, the questions are whether the "Open Meetings Law" La.R.S. 42:4.1 through 13) — and R.S. 42:9 as an integral part of it — applies to a parish council operating under a Home Rule Charter and whether there is any real conflict between the "Open Meetings Law" and the Home Rule Charter provisions or activities of the parish council taken pursuant to its Home Rule Charter. Implicit in these issues are also questions as to how state statutory and Home Rule Charter provisions would apply to the factual situation and what the remedies would be.
It is our opinion that the "Open Meetings Law" La.R.S. 42:4.1 through 13) does indeed generally apply to parishes and municipalities operating under Home Rule Charters.
Attorney General Opinion 94-153 (a copy of which is enclosed) reviewed the powers of Home Rule Charter local governments and the powers of the Legislature and concluded, in pertinent part, that state statutes may not (1) affect the structure and organization of any governmental subdivision which operates under a home rule charter, nor (2) alter the particular distribution and redistribution of the powers and functions of such a governmental subdivision but that the powers and functions of a local governmental subdivision which operates under a home rule charter are subject to change by general law of the legislature and the constitution. It also concluded that the state Legislature may exercise the police power of the state, which
 "has been described generally as `[t]he inherent power of the state to govern persons and things, within constitutional limits, for the promotion of general security, health, morals and welfare.'" [quoting from Francis v. Morial, 455 So.2d 1168, 1172 (La. 1984).]
A state statute enacted under the state's police power is one that "is necessary to protect vital interest of the state as a whole," City of NewOrleans v. Board of Commissioners of the Orleans Levee District, 93-0690 (La. 7/5/94) at pp. 19-20, 640 So.2d 237, 249; Merritt McDonaldConstruction, Inc. v. Parish of East Baton Rouge, 98-1032 (La.App. 1st Cir. 5/14/99) at p. 7, 742 So.2d 564, 568. "To sustain legislation under the police power, the courts must find its operation tends in some degree to prevent an offense or evil or otherwise to preserve public health, morals, safety or welfare," Francis v. Morial, 455 So.2d 1168, 1172-1173
(La. 1984); Lafourche Parish Council v. Autin, 94-0985 (La. 12/9/94) at p. 17, 648 So.2d 343. 356. The "Open Meetings Law," in our opinion fits the definition of a state law enacted under its police power. It tends to prevent the evil of secretive governmental deliberations by any public body at any level of government. It secures the vital interest of the state as a whole — viz., the statewide interest that "[i]t is essential to the maintenance of a democratic society that public business be performed in an open and public manner and that the citizens be advised of and aware of the performance of public officials and the deliberations and decisions that go into the making of public policy," La.R.S. 42:4.1(A) — by assuring at every level of government throughout the state that proceedings of public bodies be open to public viewing.
Moreover, although no violation of the "Public Meetings Law" was found, the courts of this state have entertained lawsuits under the "Public Meetings Law" involving local government entities operating under Home Rule Charters. See, for example, Common Cause v. Morial, 506 So.2d 167
(La.App. 4th Cir. 1987) writ den. 512 So.2d 458 (1987) (the Mayor of the City of New Orleans and the commission that operates its Audubon Park) and M.K.L. Development, L.L.C. v. City of New Orleans, 99-1516 (La.App. 4th Cir. 10/16/00), 772 So.2d 711, writ den. 00-3124 (La. 1/5/01),778 So.2d 1146. Furthermore, the Attorney General is one of the officers charged with the enforcement of the "Open Meetings Law" [see La.R.S.42:10(A)], and in his written opinions, he has steadfastly required public bodies operating under Home Rule Charters to comply with the provisions of the "Open Meetings Law." See, for example, Attorney General Opinions No. 88-495 (City of Baton Rouge-Parish of East Baton Rouge), No. 93-315 (City of Lafayette), and No. 96-314 (City of Shreveport) [copies of these opinions are enclosed]. Until a court holds otherwise, this office will adhere to this conclusion.
In addition, while there may or may not be some slight overlap in the requirements of the "Open Meetings Law" and the Lafourche Parish Home Rule Charter so that they may or may not supplement one another, there appear to be no direct conflicts between the two. The parish council can comply with both authorities. To even reach the issue of whether a local provision under a Home Rule Charter prevails over a state statute, orvice-versa, the person raising the issue
 "must show that the local law conflicts with an act of the state legislature. To establish that the conflict actually exists, the litigant must show that the state statute and the ordinance are incompatible and cannot be effectuated in harmony."
Merritt McDonald Construction, Inc., supra, at p. 7, 742 So.2d at 569
[quoting from City of New Orleans v. Board of Commissioners of theOrleans Levee District, supra, at p. 27, 640 So.2d at 252]. That is, to have an irreconcilable conflict that cannot be harmonized, the local provision must "permit what a statute forbids, or forbid what a statute expressly permits," State ex rel. Sutton v. Caldwell, 195 La. 507, 518,197 So. 214, 217 (La. 1940). Such an irreconcilable conflict does not exist if the local provision merely "supplement[s] a statute or cover[s] any part of an authorized field of local legislation that is not covered by state legislation," id, 197 So. at 217-218. Thus, the "Open Meetings Law" would apply to the Lafourche Parish Council because there is nothing in the Lafourche Parish Home Rule Charter or any ordinance that would prevent it from applying.
But even though we think that the "Open Meetings Law" is generally applicable to the Lafourche Parish Council, we do not think that La.R.S.42:9 is applicable to help resolve the problems addressed in your opinion request. La.R.S. 42:9 reads,
"§ 9. Voidability
 "Any action taken in violation of R.S. 42:4.1
through R.S. 42:8 shall be voidable by a court of competent jurisdiction. A suit to void any action must be commenced within sixty days of the action."
The case of Hoffpauir v. State thru Dept. of Public Safety Corrections, 99-1089 (La.App. 1st Cir. 6/23/00), 762 So.2d 1219, held that the sixty day limitation to bring the voidability lawsuit is peremptive and not merely prescriptive. If this statute were applicable as the sole remedy for the deficiencies which your request refers to, the ordinances would be valid, because sixty days has expired since their adoption. However, La.R.S. 42:9, by its own language, applies only to "[a]ny action taken in violation of R.S. 42:4.1 through R.S. 42:8." The deficiencies referred to in your request were not violations of La.R.S.42:4.1 through 8 but rather violations of Lafourche Parish's own Home Rule Charter provisions.
As we stated in our answer to question 7, supra, the Lafourche Parish Home Rule Charter, Art. IV, § B(1), emphatically reads, "an ordinance shall be enacted only in the manner provided in this section." Since these provisions of the charter, quoted above, comprise the exclusive method by which ordinances may be adopted by Lafourche Parish, failure to comply with these provisions, in our opinion, is fatal to the ordinance. Remedies would include the declaratory action (to have the court declare them null and void for not having been adopted in accordance with the charter) and injunctive relief (to have the court enjoin their enforcement). Likewise, if you initiate a criminal prosecution based on a violation of an improperly adopted ordinance, the defendant can attack the validity of the ordinance in a motion to quash. Accordingly, there are many procedural remedies that already exist and can be invoked.
Trusting this opinion has adequately answered your request, we remain
Very truly yours,
 RICHARD P. IEYOUB Attorney General
 By __________________________________ THOMAS S. HALLIGAN Assistant Attorney General
Encl.
cc: Honorable Gerald "Buzz" Breaux, Lafourche Parish President
DATE RELEASED: May 30, 2003
 Thomas S. Halligan Assistant Attorney General
OPINION NUMBER 96-314
OCTOBER 15, 1996
90-B-4 PUBLIC MEETINGS — State Local Governing Bodies LSA-R.S. 42.1 et seq.; LSA-R.S. 42:4.2(1); LSA-R.S. 42:5(A) LSA-R.S. 42:6,42:1 42:2 Atty.Gen.Op. Nos. 93-315, 91-339,
A team building seminar with a professional facilitator and an agenda, designed to improve communication and the working relationship between the Shreveport City Council and the Shreveport Mayor's Office constitutes a "meeting" and is subject to the Open Meetings Law.
Mayor Robert W. "Bo" Williams City of Shreveport Office of the Mayor P.O. Box 31109 Shreveport, LA 71130
Dear Mayor Williams:
This office is in receipt of your opinion request where you ask us to consider whether a team building seminar designed to improve the relationship between the Shreveport City Council and the Mayor's office must comply with the Louisiana Open Meetings Law (LSA-R.S. 42:1 et seq.) You advise us per your request that a professional facilitator with an agenda set to accomplish the aforementioned goal will attend the seminar. The seminar will include the Shreveport City Council and its staff and the Mayor and the Mayor's immediate staff. Your letter of clarification indicates that the purpose of the seminar will be to improve interpersonal communication between the Council and Mayor. We assume from your letters that there will be no official business or plans discussed.
The seminar you speak of will need to comply with the Louisiana Open Meetings Law if it is defined as a meeting. LSA-R.S. 42:4.2(1) provides:
 "`Meeting' means the convening of a quorum of a public body to deliberate or act on a matter over which the public body has supervision, control, jurisdiction, or advisory power. It shall also mean the convening of a quorum of a public body by the public body or by another public official to receive information regarding a matter over which the public body has supervision, control, jurisdiction, or advisory power." (Emphasis added)
In the present situation, it is conceded per your letter of request that a quorum of the City Council will be present at the seminar.
We are of the opinion that the seminar would not be defined as a meeting. The purpose of the seminar as stated in your request is to improve communication and the working relationship between the mayor and the city council. Essentially, the City Council will be receiving information on its future working relationship and communication with the Mayor and Administration. Defining its future actions and relationship with the Mayor and Administration is a matter over which the board has control. In La. Atty. Gen. No. 93-315, this office was of the opinion that "A private session of a quorum of the Lafayette City Council held to discuss `goal seeking' efforts of the municipality would be violative of the Open Meetings Law." Similarly in La. Atty. Gen. Op. No. 91-339, this office was of the opinion that a retreat or seminar attended by a quorum of a public body, for planning the future actions of that body, was subject to the Open Meetings Law.
In conclusion, the seminar planned is considered a meeting under the Open Meetings Law, and it must comply with the requirements set forth in the Open Meetings Law. Specifically LSA-R.S. 42:5(A.) Provides, "Every meeting of any public body shall be open to the public unless closed pursuant to R.S. 42:6, R.S. 42:6.1, or 42:6.2." None of these exceptions would allow the meeting to be closed, so the normal requirements for an open meetings of the City Council must be followed.
We hope the foregoing sufficiently answers your question. Should you have further inquiries, please contact this office.
Very truly yours,
 RICHARD P. IEYOUB ATTORNEY GENERAL
 BY: ___________________________ J. RICHARD WILLIAMS Assistant Attorney General
RPI/JRW/bs/pb
OPINION NUMBER 91-339
RELEASED JUNE 19, 1991
90-B-4 — PUBLIC MEETINGS — State and Local Governing Bodies LSA-R.S. 42:4.2A(1)
When the public business of planning for the future of a public body is discussed at a retreat or seminar by a quorum of that body, Louisiana's Open Meetings law applies.
Bill Lynch Inspector General State of Louisiana P.O. Box 94095 Baton Rouge, Louisiana 70804-9095
Dear Mr. Lynch:
Your opinion request asked if a proposed retreat by the Board of the East Jefferson General Hospital in Scottsdale Arizona would be a violation of the states' Open Meetings Law (La.R.S. 42:1-42:12). The particulars of the retreat are contained in a newspaper article attached to your opinion request.
La.R.S. 42:4.2 A(1) defines meetings subject to the Open Meetings Law as follows:
 "Meeting" means the convening of a quorum of a public body to deliberate or Act on a matter over which the public body has supervision, control, jurisdiction, or advisory power. It shall also mean the convening of a quorum of a public body by the public body or by another public official to receive information regarding a matter over which the public body has supervision, control, jurisdiction, or advisory power."
This office, in an earlier opinion numbered 89-265, dealing with the same East Jefferson Hospital Board, stated that a mere suspicion that business would be discussed or deliberations had at a retreat would be insufficient for our office to conclude that training seminars and retreats are included in the definition of "meeting" of R.S. 42:4.2. A copy of that opinion is enclosed for your reference.
The fact situation presented in your request, however, requires that we reach a different result.
The following listed facts lead us to conclude that this retreat is indeed subject to the state's Open Meetings Law.
 1. All 12 board members will go on the trip thereby assuring a quorum.
 2. A seven-member executive management team and at least two representatives from the medical committee will go on the trip.
 3. The avowed purpose of the trip, according to the Board's president is to maintain the "work momentum" now that the vision statement has been written so that it is fulfilled by 2000."
The vision statement referred to is a plan for the future of the hospital. It is apparent that the board intends to use the retreat as a forum or workshop for continued planning for the hospital thereby coming within the definition of a public meeting contained in R.S. 42:4.2 A(1);
 "to deliberate or act on a matter over which the public body has supervision . . .
 "to receive information regarding a matter over which the public body has supervision . . .
The planning of the future of the hospital to the year 2000 is such a matter.
In our opinion, the proposed retreat is an activity covered by Louisiana's Open Meetings Law.
Trusting the foregoing answers your question, we remain
Sincerely,
 WILLIAM J. GUSTE, JR. Attorney General
 BY: ___________________________ JAMES M. ROSS Assistant Attorney General
OPINION NUMBER 93-315
RELEASED APRIL 20, 1993
77 — OFFICERS — Local Municipal; Selection, Qualifications Tenure; vacancies. 90-B-4 — PUBLIC MEETINGS — State Local Governing Bodies. R.S. 42:4.1 et. seq, R.S. 42:4.2(A)(2), R.S.42:6, R.S. 42:6.1, R.S. 42:4.2(A)(1), R.S. 42:7
A private session of a quorum of the Lafayette City Council held to discuss "goal seeking" efforts of the municipality would be violative of the Open Meetings Law.
Mr. Aros G. Mouton Chief Administrative Officer P.O. Box 4017-C Lafayette, LA 70502
Dear Mr. Mouton:
This office is in receipt of your opinion request directed to Attorney General Richard P. Ieyoub, which has been assigned to me for resolution. You ask if it is legally permissible for the Mayor and City Council of the City of Lafayette to convene in a session closed to the public to discuss "goal seeking".
The provisions of LSA-R.S. 42:4.1, et. seq., contain the state Open Meetings Law and are applicable to meetings of public bodies defined therein. A "public body" includes village, town, and city governing authorities such as the Lafayette City Council. LSA-R.S. 42:4.2(A)(2). Every meeting of a municipal governing authority is required by statute to be open to the public unless closed because of the necessity to convene in executive session (LSA-R.S. 42:6) or closed because of an exception to the open meetings law (LSA-R.S. 42:6.1).
A "meeting" is defined by statute as:
 "`Meeting' means the convening of a quorum of a public body to deliberate or act on a matter over which the public body has supervision, control, jurisdiction, or advisory power. It shall also mean the convening of a quorum of a public body by the public body or by another public official to receive information regarding a matter over which the public body has supervision, control, jurisdiction, or advisory power." LSA-R.S. 42:4.2(A)(1).
This office is of the opinion that "goal seeking" falls within those matters over which the Lafayette City Council has "supervision, control, jurisdiction, or advisory power." A gathering of a quorum of the Lafayette City Council convened to deliberate, act, or receive information regarding "goal seeking" efforts of the municipality is a "meeting" which must be held open to the public. In this instance, the Lafayette City Council must conduct the meeting in public, after complying with those written public notice requirements of the statute (LSA-R.S. 42:7).
We hope the foregoing sufficiently answers your questions. Should you have further inquiries in which we may be of assistance, please contact this office.
Very truly yours,
 RICHARD P. IEYOUB Attorney General
 BY: _____________________________ KERRY L. KILPATRICK Assistant Attorney General
RPI/KLK/0239E
OPINION NUMBER 88-495
October 26, 1988
48 — GAMBLING — Lotteries, Bingo, Chance Promotional Schemes
90-B-4 — PUBLIC MEETINGS — State Local Governing Bodies
L.S.A.-R.S. 42:5
L.S.A.-R.S. 42:6.1
Provision of East Baton Rouge Bingo Ordinance closing administrative hearing of Bingo Ordinance closing administrative hearing of Bingo Control Board invalid for violation of Open Meeting Law.
Mr. Lynn E. Williams, Parish Attorney Parish of East Baton Rouge P.O. Box 1471 Baton Rouge, Louisiana 70821
Dear Mr. Williams:
You have requested an opinion regarding a possible conflict between a provision of the East Baton Rouge Ordinance No. 8749, which provides for the licensing of bingo and raffles in the Parish of East Baton Rouge, and the Open Meeting Law of Title 42 of the Revised Statutes. In our opinion this conflict is irreconcilable, and the provision of the local Bingo Ordinance is invalid due to the operation of the state statute.
Ordinance 8749, § 19 provides for a Bingo Control Board to administer the enforcement of violations of provisions of the Ordinance. § 19D(1), paragraph 2 grants those persons charged with such violations the right to close the administrative meeting by the Bingo Control Board upon their request. The same paragraph ordains that all such meetings be open to the public.
All meetings of any public body must be open to the public. L.S.A.-R.S. 42:5. Procedurally, the public body must by a public two-thirds majority vote elect to go into an executive session closed to the public. L.S.A.-R.S. 42:6. Substantively, the public body can do so only for the grounds specified by L.S.A.-R.S. 42:6.1, or if a legislative body, R.S. 42:6.2.
Your suggestion that the closed hearing contemplated by the Ordinance would be justified by R.S. 42:6.1A(1), which allows an executive session to discuss the character of a person, is ill-founded. The purpose of the administrative hearing contemplated by your ordinance is not to discuss character, but conduct. Every prohibitory norm of the law prohibits acts, regardless of the character of the actor. The purpose of the hearing is adjudicatory: to determine if the individual has committed prohibited acts, which trigger certain sanctions as a matter of law regardless of whether that person has even the most impeccable character. This legislative exception does not apply to discussions of prohibited behavior.
Nor is an executive session justified by R.S. 42:6.1A(4), authorizing a closed hearing regarding investigations into misconduct. This provision refers to pre-adjudicatory proceedings, whereas the hearing provided by the Ordinance is an adjudicatory hearing invested with full legal formality.
In conclusion, Ordinance 8749, Section 19D(1), paragraph 2, is invalid insofar as it conflicts with L.S.A.-R.S. 42:5, to wit; that it allows a public hearing of the Bingo Control Board to be closed upon the simple request of the person before the Board, without compliance with R.S. 42:6.1. Because of this substantive deficiency, it is of no legal moment that the Board might vote to close the hearing by a two-thirds' vote.
Trusting this to be of sufficient information, I am
Sincerely,
 WILLIAM J. GUSTE, JR. Attorney General
 BY: ___________________________ CHARLES J. YEAGER Assistant Attorney General
CJY:tm
OPINION NUMBER 94-153
RELEASED JULY 1, 1994
71-1-B — MUNICIPALITIES — City Parish Charter CONST 6.6
State law may only provide general laws which neither (1) affect the structure and organization of any governmental subdivision which operates under a home rule charter, nor (2) alter the particular distribution and redistribution of the powers and functions of such a governmental subdivision. (Article VI, Section 6 of the 1974 Louisiana Constitution) However, the powers and functions of a local governmental subdivision which operates under a home rule charter are subject to change by general law of the legislature and the constitution, in accordance with Article VI, Section 5 of the Constitution.
Hon. James J. Licciardi, Jr. Councilman, St. Bernard Parish Gov. 8201 West Judge Perez Drive Chalmette, Louisiana 70043
Dear Councilman Licciardi:
We are in receipt of your request for an Attorney General's opinion regarding the powers of a home rule charter form of government. Specifically, you have requested an opinion on when state law takes precedence over a home rule charter.
The St. Bernard Charter provides for general powers and special powers as follows:
Section 1-04 General Powers
 Except as otherwise provided by this charter, the parish government shall continue to have all of the powers, rights, privileges, immunities, and authority heretofore possessed by St. Bernard Parish under the constitution, statutes, and laws of the State of Louisiana. The parish government shall have and exercise such other powers, rights, privileges, immunities, authority, and functions not inconsistent with this charter as may be conferred on or granted to a local governmental subdivision by the constitution, statutes, and laws of the State of Louisiana. More specifically, the parish government shall have and is hereby granted the right and authority to exercise any power and perform any function necessary, requisite, or proper for the management of affairs not denied by this charter and neither denied by nor inconsistent with the constitution, statutes, and laws of the State of Louisiana.
Section 1-05 Special Powers
 The parish government shall have the right, power, and authority to pass all ordinances requisite or necessary to promote, protect, and preserve the general welfare, safety, health, peace, and good order of the parish, including, but not by way of limitation, the right, power, and authority to pass ordinances on all subject matter necessary, requisite, or proper for the management of parish affairs, and all other subject matter without exception, subject to the limitation that the same shall not be inconsistent with the constitution, statutes, or laws of the State of Louisiana or with this charter.
The Louisiana Supreme Court, in the case of Francis v. Morial,455 So.2d 1168 (La. 1984), thoroughly reviewed the constitutional provisions pertaining to the powers and functions of home rule charters. The court recognized that Article VI of the 1974 Louisiana Constitution promotes the autonomy of home rule governments by delegating to them broad revocable powers and functions. Section 5 of Article VI sets forth procedures by which a home rule charter may be adopted and authorizes a home rule government to assume any power or function necessary, requisite or proper for the management of its affairs, not denied by general law or inconsistent with the constitution. And Section 6 of Article VI provides that no law shall change or affect the structure and organization or the particular distribution and redistribution of the powers and functions of such local governments.
Additionally, the court reviewed the provisions of Section 9(B) of Article VI, which provides that, notwithstanding any provision of Article VI, the police power of the state shall never be abridged. This police power has been described generally as "[t]he inherent power of the state to govern persons and things, within constitutional limits, for the promotion of general security, health, morals and welfare." Francis, at 1172.
In general terms, the Supreme Court found that "[S]ection 6 (of Article VI) . . . was intended to prevent the legislature from substituting its judgment for that of the home rule government with respect to the arrangement of the various offices, departments, agencies and elements of the local government, and as to the assignment, allocation or distribution of purposes, work, authority and capacities among them." Id. at 1171. We are enclosing a copy of the case of Francis v. Morial, which we find to be a clear annunciation by our Supreme Court as to the powers and functions of a home rule charter government.
In sum, it is our opinion state law may only provide general laws which neither (1) affect the structure and organization of any governmental subdivision which operates under a home rule charter, nor (2) alter the particular distribution and redistribution of the powers and functions of such a governmental subdivision. (Article VI, Section 6 of the 1974 Louisiana Constitution) However, the powers and functions of a local governmental subdivision which operates under a home rule charter are subject to change by general law of the legislature and the constitution, in accordance with Article VI, Section 5 of the Constitution.
The provisions of the St. Bernard Charter which provide for the general and special powers of the local government are, in our opinion, consistent with the similar provisions of the 1974 Louisiana Constitution.
We hope this opinion has adequately addressed all of your concerns in this matter; however, if we can be of further assistance, please contact our office.
Yours very truly,
 RICHARD P. IEYOUB Attorney General
BY: ANGIE ROGERS LaPLACE Assistant Attorney General RPI/ARL:pb/0265s Enclosure
 Norman C. FRANCIS, et al v. Ernest N. MORIAL, et al No. 84-CA-0159. Supreme Court of Louisiana. Sept. 10, 1984.
Members of New Orleans Aviation Board brought action to have declared unconstitutional a statute giving neighboring city and parishes in which the airport was located the power to participate in the selection of members of the Board. The Civil District Court, Parish of Orleans, Gerald P. Fedoroff, J., declared the statute unconstitutional and the Attorney General, who had intervened appealed. The Supreme Court, Dennis, J., held that the statute purported to change the New Orleans home rule character's distribution of powers and functions pertaining to the selection and appointment of aviation board members and did not constitute a reasonable exercise of the police power and thus was unconstitutional, even if the law were a general law.
Affirmed.
Watson, J., concurred and filed an opinion.
1. Municipal Corporations 65
Home rule charter government possesses, in affairs of local concern, powers which within its jurisdiction are as broad as those of the state, except when limited by the Constitution, laws permitted by the Constitution, or its own home rule charter. LSA-Const. Art. 6. §§ 4, 5.
2. Municipal corporation 65
Provision of the Constitution granting to home rule bodies the discretion to deploy their powers and functions on the local level a discretion which may not be revoked, changed, or affected except in limited circumstances, was intended to prevent the legislature from substituting its judgment for that of the home rule government with respect to the arrangement of the various offices, departments, agencies, and elements of the local government and as to the assignment, allocation, or distribution of purposes, work, authority and capacities among them. LSA-Const. Art. 6, §§ 6, 9(B).
3. Constitutional Law 81
Although "police power" is not susceptible of precise definition except on a case-by-case basis, it is generally described as the inherent power of the state to govern persons and things, within constitutional limits, for the promotion of the general security, health, morals, and welfare.
 See publication Words and Phrases for other judicial contructions and definitions.
4. Constitutional Law 81
Police power extends only to such measures as are reasonable and all police regulations must be reasonable under all circumstances.
5. Constitutional Law 81
In order for a police measure to be reasonable, the means adopted must be reasonably necessary and appropriate for the accomplishment of legitimate objects falling within the scope of that power; the measure must tend toward the accomplishment or promotion of such purpose in a degree that is reasonably perceptible and clear.
6. Constitutional Law 81
To sustain legislation under the police power, the courts must be able to see that its operation tends in some degree to prevent an offense or evil or otherwise to preserve public health, morals, safety, or welfare and, if a statute discloses no such purpose, has no real or substantial relation to these objects, or is a palpable invasion of rights secured by fundamental law, it is the duty of the courts to so adjudge and thereby give effect to the Constitution.
7. Constitutional Law 81
To be truly in the public welfare, legislation must confer upon the public benefits which are commensurate with its burdens upon others protected interests; police power does not justify an interference with constitutional rights which is entirely out of proportion to any benefit redounding to the public.
8. Municipal Corporations 65
Home rule entities must be regarded as more than creatures of the legislature since their powers and functions are granted directly by the Constitution and their discretion of deployment is constitutionally preserved against undue interference; home rule abilities and immunities are bestowed by the Constitution in terms too full and general to warrant narrow construction of them by the courts. LSA-Const. Art. 6, §§ 6, 9(B).
9. Municipal Corporation 65
Home rule powers, functions, and immunities should be construed fairly, genuinely, and reasonably and any claimed exception to them should be given careful scrutiny by the courts. LSA-Const. Art. 6, § 1 et seq.
10. Aviation 212
Statute which granted to neighboring parishes and city the power to participate in the selection of members of the New Orleans Aviation Board purported to change the home rule government's distribution of the power and function of selecting board members and did not constitute a reasonable exercise of police power and was not necessary to prevent an abridgment of the reasonable exercise of the state's police power and thus violated the home rule provisions of the Constitution. LSA-Const. Art. 6, §§ 6, 9(B); LSA-R.S. 2:131.1.
11. Aviation 212
Even if law giving to city and parishes in which New Orleans airport was located the power to appoint some members of the New Orleans Aviation Board were a general law, it was prohibited because it changed a home rule government's distribution of its powers and functions. LSA-Const. Art. 6 § 6.
Mack E. Barham, John Whitney, Thomas G. Gruenert, Barham 
Churchill, George W. Reese, Charles H. White, New Orleans, for plaintiffs-appellees.
H.A. Vondenstein, Parish Atty., James S. Arceneaux, Asst. Parish Atty., George Giacobbe, Kenner, Harry J. Morel, Jr., Dist. Atty., Steve Griffith, Asst. Dist. Atty., William J. Guste, Jr., Atty. Gen., Kendall L. Vick, Asst. Atty. Gen., Melissa F. Keegan, Staff Atty., New Orleans, for defendant-appellants.
Salvador Anzelmo, City Atty., Thomas W. Milliner, Deputy City Atty., for Defendant-Appellees.
DENNIS, Justice.
We are called upon to decide whether an act of the legislature altering the procedure for selecting members of a home rule municipality's administrative board should be upheld as necessary to prevent abridgement of a reasonable exercise of the state's police power or stricken as an interference with local deployment with local deployment of home rule charter powers and functions prohibited by the state constitution. A suit was brought by the present members of the municipal board to have the statute declared unconstitutional and to enjoin its enforcement. After a hearing, the trial court declared the act unconstitutional and permanently enjoined its implementation. The attorney general intervened to assert and protect the rights and interests of the state, La. Const., Art. IV, § 8, and appealed directly to this court. La. Const., Art.V, § 5(D). We affirm. The Louisiana Contitution of 1974 delegates powers and functions to home rule charter governments and grants them the discretion to deploy their powers and functions on the local level. The legislature by a general law may deny or revoke the initial delegation of home rule powers and functions; no law may revoke, change or affect a home rule government's discretion to deploy its powers and functions, however, unless it is necessary to prevent an abridgement of the reasonable exercise of the state's police power. The act of the legislature in the present case is prohibited by the constitution because it changes the distribution and organization of home rule powers and functions and is not reasonably necessary and appropriate for the accomplishment of a legitimate object of the police power.
The City of New Orleans, located in the parish of Orleans, owns and operates an airport located in the City of Kenner and the parishes of Jefferson and St. Charles. The New Orleans home rule charter establishes an aviation board consisting of five members to be appointed by the Mayor with the approval of the city council. The charter provides that the functions of the board shall be to administer, operate and maintain all city airports, represent the City in all aeronautical consultations with state, national or international agencies, and appoint an Aviation Director to serve at its pleasure. Charter § 5-702. Before adoption of the 1974 Louisiana Constitution, the legislature by Act 424 of 1972 expanded the board to nine members and prescribed, in effect, that two members must either reside or have a business located in Jefferson and St. Charles Parishes. The constitutionality of this change in composition and residence or principal place of business requirement is not challenged by this lawsuit.
The act in question in this case, Act 25 of 1983, amended and reenacted the prior law by changing and affecting the membership of any airport board of a city located outside the parochial site of its airport, in pertinent part, as follows: (a) the board shall include one additional member, to be appointed by the mayor and approved by the governing authority, from a list of two names submitted by the chief executive of each parish in which the airport is located; (b) if the airport is located within a municipality, the board shall include two additional members to be appointed from a list of four names submitted by the mayor of the municipality in which any part of the airport is located; (c) if the mayor of the city which owns the airport fails to make the appointments timely upon receipt of the lists or if the governing authority fails to approve his appointments timely, the chief executives and the mayor submitting the lists shall make the appointments with approval of their respective governing authorities.
New Orleans is the only city affected by this legislation. In effect, the statute permits the City of Kenner, the Parish of Jefferson and the Parish of St. Charles to choose four of the nine members of the New Orleans aviation board.
Before any appointments were made pursuant to the act, the members of the New Orleans Aviation Board brought this suit to have the statute declared unconstitutional. After a hearing, the trial court declared the statute unconstitutional and enjoined its enforcement. In oral reasons for judgment, the trial court declared the act unconstitutional as an invasion of a home rule charter which changed and affected the structure and organization of the local government. The attorney general intervened and appealed.
[1] Article VI of the 1974 Louisiana Constitution promotes the autonomy of home rule governments by delegating to them broad revocable powers and functions. Section 4 permits each preexisting home rule charter government to retain the powers, functions and duties in effect in its charter when the constitution was adopted, except as inconsistent with the constitution, and to add to its charter any power or function granted by the constitution to other local governments if its charter permits.[1]
Section 5 sets forth procedures by which a home rule charter may be adopted and authorizes a home rule government to assume any power or function necessary, requisite or proper for the management of its affairs, not denied by general law or inconsistent with the constitution.[2] Consequently, a home rule charter government possesses, in affairs of local concern, powers which within its jurisdiction are as broad as that of the state, except when limited by the constitution, laws permitted by the constitution, or its own home rule charter.
The constitution in article VI also fosters local self-government by granting to home rule bodies the discretion to deploy their powers and functions on the local level, which may not be revoked, changed or affected by law unless necessary to prevent an abridgement of the reasonable exercise of the state's police power. Section 6 provides that no law shall change or affect the structure and organization or the particular distribution and redistribution of the powers and functions of such local governments.[3] Section 9(B) provides that, notwithstanding any provision of Article VI, the police power of the state shall never be abridged. In the present case, the tension between home rule discretion and state police power calls upon us to reach a more complete understanding of these concepts in order to accommodate these constitutionally protected interests.
[2] Section 6 was added to the local government article to protect home rule charter governments from unwarrantable interference in their internal affairs by state government. It is clear from the convention proceedings and the words of Section 6 that it was intended to prevent the legislature from substituting its judgment for that of the home rule government with respect to the arrangement of the various offices, departments, agencies and elements of the local government, and as to the assignment, allocation or distribution of purposes, work, authority and capacities among them. Unless the constitution elsewhere provides justification for such an intrusion, any state law which changes or affects, i.e., produces an alteration in or material influence upon, the local government's structure and organization or the distribution or redistribution of its powers and functions is prohibited. VII Records of the Louisiana Constitutional Convention of 1973: Convention Transcripts 1341, 1361 [hereinafter referred to as Records]. See also Murchison, Developments in the Law, 1982-1983 — Local Government Law, 44 La. L.Rev. 373, 389 (1983); Murchison, Developments in the Law, 1979-1980 — Local Government Law, 41 La.L.Rev. 483, 485 (1981); Kean, Local Government and Home Rule, 21 Loy.L.Rev. 63, 66 (1975); Comment, Exclusive Powers of Louisiana Home Rule Municipalities and Parishes, 23 Loy.L. Rev. 961(1977).
As a counterbalance, to preclude the danger that the powers and defenses afforded local government would be used to deprive the state government of its necessary inherent powers, Article VI, Section 9(B) provides that "[n]otwithstanding any provision of this Article, the police power of the state shall never be abridged." This provision is almost identical to formulations set forth in the 1913, 1918, and 1921 Louisiana constitutions.[4] After tentatively adopting a different, perhaps more expansive affirmation of police power,[5] the framers of the 1974 Louisiana constitution ultimately opted to retain the traditional language and its more settled meaning.[6]
[3-7] The decisions of this court and others establish principles governing the exercise of the police power and the prevention of its abridgement with which the delegates were familiar. Although the police power is not susceptible to precise definition except on a case by case basis, it has been described generally as the inherent power of the state to govern persons and things, within constitutional limits, for the promotion of general security, health, morals and welfare. Fernandez v.Alford, 203 La. 111, 13 So.2d 483 (1943); State v. Malory, 168 La. 742,123 So. 310 (1929); VII Records 1445 (statement of Delegate Avant), 1454 (statement of Delegate Casey). The police power extends only to such measures as are reasonable, however, and all police regulations must be reasonable under all the circumstances. Schwegmann Bros. v. La. Bd. ofAlcoholic Bev. Control, 216 La. 148, 43 So.2d 248 (1949); VII Records 1446 (statement of Delegate Avant). In order for a police measure to be reasonable, the means adopted must be reasonably necessary and appropriate for the accomplishment of legitimate objects falling within the scope of the power. Schwegmann Bros. v. La.Bd. of Alcoholic Bev.Control, 216 La. 148, 43 So.2d 248 (1949). Accordingly, the measure must tend toward the accomplishment or promotion of such purpose in a degree that is reasonably perceptible and clear. Id; City of New Orleans v.Southern Auto Wreckers, 193 La. 895, 192 So. 523 (1939); Barrett v.State, 220 N.Y. 423, 116 N.E. 99 (1917); State ex rel. Wilcox v.Gilbert, 126 Minn. 95, 147 N.W. 953 (1914); St. Louis Southwestern Ry.Co. of Texas v. Griffin, 106 Tex. 477, 171 S.W. 703 (1914). To sustain legislation under the police power, the courts must be able to see that its operation tends in some degree to prevent an offense or evil or otherwise to preserve public health, morals, safety or welfare, Eros v.Powell, 137 La. 342, 68 So. 632 (1915); Hi-Lo Oil Co. v. City ofCrowley, 274 So.2d 757 (La.App. 3d Cir.), writ refused, 277 So.2d 673
(La. 1973), and if a statute discloses no such purpose, has no real or substantial relation to these objects, or is a palpable invasion of rights secured by fundamental law, it is the duty of the courts so to adjudge and thereby give effect to the constitution. Id.; State ex relGalle v. N.O., 113 La. 371, 36 So. 999 (1904). It is only because the welfare of the whole people so far outweighs the importance of the individual whose rights are interfered with by an exercise of the police power that such interference with constitutional guarantees can be justified. See City of Shreveport v. Curry, 357 So.2d 1078 (La. 1978);Appeal of Meserve, 120 N.H. 461, 417 A.2d 11 (1980); Town of Bay HarborIslands v. Schiapik, 57 So.2d 855 (Fla. 1952); 16A Am.Jur.2d, Constitutional Law, § 415. To be truly in the public welfare, therefore, legislation must confer upon the public benefits commensurate with its burdens upon other protected interests. Banjavich v. La.Licensing Bd. for Marine Divers, 237 La. 467, 111 So.2d 505 (1959);Direct Plumbing Supply Co. v. City of Dayton, 138 Ohio St. 540,38 N.E.2d 70 (1941); 16A Am.Jur.2d, Constitutional Law, § 415. The police power does not justify an interference with constitutional rights which is entirely out of proportion to any benefit redounding to the public. Myers v. City of Defiance, 67 Ohio App. 159, 36 N.E.2d 162
(1940); Am.Jur.2d, Constitutional Law, § 415.
[8, 9] It is therefore self-evident that Article VI of the 1974 Louisiana constitution strikes a different balance of power between the state legislature and home rule governments than that which existed under previous constitutions. Home rule entities must be regarded as more than creatures of the legislature, since their powers and functions are granted directly by the constitution and their discretion of deployment is constitutionally preserved against undue interference. Kean, supra at 66; Murchison, supra 41 La.L.Rev. 483, at 487-88. Home rule abilities and immunities are bestowed by the constitution in terms too full and general to warrant narrow construction of them by the courts. Kean, supra at 66. The framers also regarded the principles which courts have developed in accommodating individual rights with the state's exercise of its police power as analogously applicable to the resolution of conflicts between police measures and the new constitutionally protected rights of home rule governments. E.g., VII Records 1446 (statement of Delegate Avant). This transformation in the constitutional philosophy of local government calls for a corresponding adjustment in the judicial attitude toward home rule prerogatives. VII Records 1363-71; City of New Orleans v. State,426 So.2d 1318, 1322 (La. 1983) (concurring opinion); City of Shreveportv. Kaufman, 353 So.2d 995 (La. 1977); Kean, supra; Murchison, supra. Hence, it is appropriate that home rule powers, functions and immunities should be construed fairly, genuinely and reasonably and any claimed exception to them should be given careful scrutiny by the courts. VII Records 1415-16.
[10] Applying these precepts to the case at hand, we conclude that the trial court correctly declared Act 25 of 1983 unconstitutional because (a) the act purports to change the New Orleans home rule charter's distribution of powers and functions pertaining to the selection and appointment of aviation board members in violation of Article VI, Section 6, and, (b) the act does not constitute a reasonable exercise of police power under Article VI, Section 9(B) so as to qualify as an exception to the prohibition against state interference with home rule discretion.
Act 25 of 1983, in effect, authorizes the chief executive officers of the City of Kenner, Jefferson Parish and St. Charles Parish to select four of the nine members of the New Orleans Aviation Board. Prior to this act only duly elected officers of the City of New Orleans were authorized to participate in selecting members of the board which administers the city's airports. The act therefore clearly purports to change the home rule government's distribution of the power and the function of selecting four board members by redistributing this faculty to public officials of other local governments. Enforcement of the act probably also would affect or materially influence the organization of the city's aviation board by installing thereon a large minority contingent representing three other local governments. It is needless for us to consider whether the statute affects home rule structure and organization, however, because the act clearly changes the distribution of home rule powers and functions.
Considering all of the circumstances, it is not reasonably clear that Act 25 of 1983 constitutes a reasonable exercise of the state's police power. We are unable to see that its operation would tend in some degree to prevent an offense or evil or otherwise to preserve public health, morals, safety or welfare. It is, of course, possible to conceive of legislation affecting airports or a reasonable classification of airports that reasonably may be necessary and appropriate to promote objects within the ambit of the police power. Act 25 of 1983, however, discloses no such purpose and does not appear to have any real or substantial relation to these objects; it merely redistributes the power and function of selecting a minority of the aviation board from the New Orleans officials to those of three other local governments. Even if we were to assume that the act would tend toward the accomplishment of a valid police power object in some slight degree, the small public benefit which might be conferred would not be commensurate with the interference and burdens placed on the home rule government.
In addition to arguments on the foregoing issues, the attorney general contends that Act 25 of 1983 is constitutional because it is a general, not a local or special, law. Implicitly, his rationale is as follows: Article VI, Section 5(E) provides that the legislature may by general law deny home rule governments any power or function authorized therein; Act25 of 1983 is a general law; therefore, Act 25 of 1983 constitutionally denies powers and functions to the home rule government.
[11] Act of 25 of 1983 does not deny any power or function originally delegated to the home rule government, however. It does not take away the City's power to administer its airports through an aviation board. Instead, it changes the distribution of this power and function at the local level. Even if we assume that the law is a general one, a matter regarding which there is reason for doubt, it is prohibited because it changes a home rule government's distribution of its powers and functions in violation of Article VI, Section 6. In order for a law changing or affecting a local government's deployment of its powers and functions on the local level to be sustained by the courts, the act must be necessary to prevent abridgement of a reasonable and valid exercise of the state's police power. Since we have determined that Act 25 of 1983 does not constitute such a law, there does not appear to be any basis upon which it can be sustained.
Accordingly, the judgment of the trial court declaring Act 25 of 1983 unconstitutional and enjoining its enforcement is affirmed.
AFFIRMED.
WATSON, J., concurs and assigns reasons.
[1] Section 4: Every home rule charter or plan of government existing or adopted when this constitution is adopted shall remain in effect and may be amended, modified, or repealed as provided therein. Except as inconsistent with this constitution, each local governmental subdivision which has adopted such a home rule charter or plan of government shall retain the powers, functions, and duties in effect when this constitution is adopted. If its charter permits, each of them also shall have the right to powers and functions granted to other local governmental subdivisions.
[2] Section 5: (A) Subject to and not inconsistent with this constitution, any local governmental subdivision may draft, adopt, or amend a home rule charter in accordance with this Section. The governing authority of a local governmental subdivision may appoint a commission to prepare and propose a charter or an alternate character, or it may call an election to elect such a commission. (B) The governing authority shall call an election to elect such a commission when presented with a petition signed by not less than ten percent of the electors or ten thousand electors, whichever is fewer, who live within the boundaries of the affected subdivision, as certified by the registrar of voters. (C) A home rule charter shall be adopted, amended, or repealed when approved by a majority of the electors voting thereon at an election held for that purpose. (D) Two or more local governmental subdivisions within the boundaries of one parish may adopt a home rule charter under this Section if approved by a majority of the electors in each affected local governmental subdivision voting thereon in an election held for that purpose. The legislature shall provide by law the method of appointment or election of a commission to prepare and propose a charter consistent with Paragraph (A) of this Section and the method by which the electors may petition for an election consistent with Paragraph (B) of this Section. However, at least one member of the commission shall be elected or appointed from each affected local governmental subdivision. (E) A home rule charter adopted under this Section shall provide the structure and organization, powers, and functions of the government of the local governmental subdivision, which may include the exercise of any power and performance of any function necessary, requisite, or proper for the management of its affairs, not denied by general law or inconsistent with this constitution. (F) Except as prohibited by its charter, a local governmental subdivision adopting a home rule charter under this Section shall have the additional powers and functions granted to local governmental subdivisions by other provisions of this constitution. (G) No home rule charter or plan of government shall contain any provision affecting a school board or the offices of district attorney, sheriff, assessor, clerk of a district court, or coroner, which is inconsistent with this constitution or law.
[3] Section 6: The legislature shall enact no law the effect of which changes or affects the structure and organization or the particular distribution and redistribution of the powers and functions of any local governmental subdivision which operates under a home rule charter.
[4] 1898 and 1913 La. Const., Art. 263, provided: "The exercise of the police power of the state shall never be abridged nor so construed as to permit corporations to conduct their business in such manner as to infringe the equal rights of individuals or the general well-being of the State."
1921 La. Const., Art. XIX, § 18, provided: "The exercise of the police power of the State shall never be abridged."
[5] "Notwithstanding any provision of any plan of local government or any home rule charter, or other provision of this article, the legislature may by general law applicable throughout the state or based upon any reasonable classification exercise the police power of the state in the parishes, municipalities, and other local governmental subdivisions of the state." VII Records 1445.
[6] See VII Records 1445-60. Delegate Burson set forth the concerns of the delegates prompting them to adopt the present language of Section 9(B) when saying that the language "was taken verbatim from the present constitution. It has a well defined historical meaning. It seems to me that we ought to be very careful, indeed before we adopt new language, undefined, that it is so broad sweeping that it would easily be open to the interpretation of an all encompassing central power." VII Records 1455.
WATSON, Justice, concurring.
I join in the reasons assigned by the majority, but would add that the City of New Orleans owns the airport just as it owns Audubon Park. Therefore, a similar issue is presented and should be decided with the same result as in City of New Orleans v. State, 443 So.2d 562 (La., 1983).
OPINION NUMBER 90-226A
JULY 2, 1990
64-2 — LOUISIANA ADMINISTRATIVE PROCEDURE LSA-R.S. 49:953
Notice for Emergency Rule must state facts which when presumed true establish one of two grounds for issuance of an emergency rule.
Ms. Vicky Hunt, Director Governor's Office of Elderly Affairs P.O. Box 80374 Baton Rouge, LA 70898-0374
Dear Ms. Hunt:
You have requested a supplementary opinion in this matter to reconsider several presumptions of fact in the original opinion as well as two interpretations of law contained therein. Your basic concern is whether the emergency rule and the contracts let thereunder are valid, and whether the permanent rule, intended to be effective on or about June 20, 1990, is lawfully adopted.
NOTICE OF INTENT
The procedure for an emergency rule is stated by R.S. 49:953B(1). This procedure when properly invoked upon one of the two (2) substantive grounds stated by that subsection is exempted from the general and fundamental requirements of the Administrative Procedure Act. These are to give fair notice to the public and an opportunity to be heard at a fair hearing, public purposes inherently safeguarded in the legislative process but which must be mandated by law in the executive equivalent of rulemaking. Because the emergency rulemaking process is extraordinary precisely because it dispenses with these fundamental safeguards of notice and hearing, the substantive grounds for its exercise are to be interpreted stricti juris, and the factual basis for the grounds are the burden of the agency promulgating the emergency rule, and are not presumed from a simple statement or conclusion by the agency that the grounds for an emergency rule are present.
However when these grounds are present, and are properly noticed, R.S. 49:953B(1) grants discretion to the rulemaker to file such abbreviated notice as is deemed proper concurrently with the promulgation of the emergency rule. The rulemaker therefore does not have to conform with the several requirements of R.S. 49:953A for a valid emergency rule to issue; the notice required is governed by R.S. 49:953 (B)(1). Whatever inconsistency exists between the notice of intent issued by your office and R.S. 49:953A with regard to the permanent rule is irrelevant to the validity of the emergency rule, which is judged by different standards.
The original opinion stated that the typed notice of intent, provided with the opinion request, for the proposed rule by GOEA on service procurement did not include the fiscal impact statement or the economic impact statement required by R.S. 49:953A (1)(a) (ii) and (iii). This statute does not require simply that such statements be issued and made publicly accessible, nor authorize them to be stapled or clipped to the notice of intent. It mandates ("The notice shall include") that the fiscal and economic impact statements be included in the test of the notice of intent. The only means of determine whether notice of these impact statements was given simultaneously with the notice of intent to promulgate the rule is if the impact statements are actually incorporated within the formal notice of intent. That is the reason that R.S. 49:953A requires their incorporation into the notice of intent. Anyone reading a Section 953A notice of intent is entitled to infer that no impact statements as required by law were in fact obtained if they are not reproduced in the notice of intent. That is precisely what this writer concluded after reading the notice of intent for GOEA's proposed rule, and being unable to locate a Louisiana Register effecting the publication of same. The notice of intent is intended to be a self-contained document, containing all necessary information mandated by the statute to constitute the requisite legal notice.
Although fiscal and economic impact statements were in fact obtained by GOEA, they were not included in the notice of intent for the promulgation of the proposed rule on service procurement. This violation of R.S. 49:953A, which is a mandatory rather than permissive rule of law for agency rulemaking, results in a procedural defect in the adoption of this proposed rule by GOEA.
The legal effect of the violation of the statute must be evaluated in the contest of the statutory purpose. The procedure effected by the Administrative Procedure Act is intended to provide an executive facsimile of the type of notice and hearing and public participation traditionally observed in the lawmaking process of the legislative branch of government. The legal incorporation of these safeguards into the rulemaking process restrains arbitrary, capricious or abusive exercises of power by executive officers and agencies.
Notice to the public has been stated to be the core safeguard; a hearing facilitates notice, as well as an opportunity for public response. Dorignac v. Louisiana State Racing Commission, 436 So.2d 667
(La.App. 4th Cir. 1983).
Although GOEA deviated from the correct procedure, it did obtain the required fiscal and economic impact statements, and did distribute those impact statements with the notice of intent. The combined impact statements were published in the Louisiana Register adjacent to the notice of intent, and clearly identified with it. The public notice contemplated by the APA, although presented in a procedurally defective way, does appear to have been substantially effected.
Further, although GOEA's compliance with the statute was imperfect in two particulars, the record indicates that it acted in good faith in attempting to comply with the law. What mistakes were made in promulgating the permanent rule were not a subterfuge to subvert the intent of the law to afford notice and hearing to the public. A notice of intent was filed, impact statements were prepared and obtained, and a hearing was held. The procedural error in the preparation of the notice of intent is de minimus non curat lex, and does not invalidate the permanent rule on service procurement.
The rule on service procurement effective June 20, 1990 was lawfully adopted.
VALIDITY OF EMERGENCY RULE
There is no justifying context to excuse the emergency rule as de minimus.
Just as the conclusion of the original opinion, that the law requires the fiscal and economic impact statements to be incorporated into the R.S. 49:953A notice of intent, has been reaffirmed, the conclusion that the emergency rule was improvidently promulgated due to its noncompliance with the provisions of R.S. 49:953B (1) is likewise reaffirmed. The nature of the error in the emergency rulemaking, however, invalidates the emergency rule as null and void ab initio.
While R.S. 49:953B (1) dispenses the executive entity from promulgating a notice of intent with the required content for the permanent rule, it also has special requirements of its own. It requires that the extraordinary procedure of emergency rulemaking can only be undertaken on one of two grounds: (1) an imminent peril to the public health, safety or welfare or (2) the imminent imposition of federal sanctions or penalties.
The public policy norm of the APA is the deliberate rulemaking procedure of R.S. 49:953A, with its features of notice, hearing and public participation. Emergency rulemaking is the extraordinary exception to this norm, in that the executive agency unilaterally dispenses with the same legal requirements and safeguards for administrative rulemaking.
The notice of intent to promulgate the emergency rule must justify its grounds. It must memorialize the grounds for the departure from the legislatively preferred procedure. Emergency rulemaking is not an alternative to the procedure of R.S 49:953A; it is an anomalous mode of executive action justified only by two narrow sets of circumstances stated in R.S. 49:953B (1).
Hence, for an emergency rule to have legal effect, the notice must state facts which if presumed true would constitute prima facie proof of one of the two grounds for emergency procedure under R.S. 49:953A. A legal conclusion that there is an imminent peril to public health, safety and welfare will not suffice; the notice must state facts which if presumed true would establish the nature and existence of such peril. This failure is the first problem with the emergency rule.
The second is the failure of GOEA to properly interpret "imminent." The facts stated in the emergency notice must reflect that one or both of the two harms which justify emergency rulemaking under R.S. 49:953B (1) will occur before regular rulemaking by normal procedure can result in an amelioration of the crisis. If there is no risk of federal sanctions being imposed before regular permanent rulemaking can be completed, with its full notice, hearing and public response facets, there is no legal cause for an emergency rule. The emergency rule is intended only to prevent one or both harms, peril to health, etc. or sanctions, from occurring before a regular rule can be adopted.
An emergency rule is not a routine procedure for an executive agency to adopt to "fill the gap" until a regular rule is adopted. There must be an emergency, which must be factually described in the notice and must conform to the two types of legal emergencies for which R.S. 49:953B (1) exclusively authorizes emergency rulemaking. For this reason an emergency rule has no legal validity unless it states facts which constitutes grounds under the statute. These facts are presumed true (prima facie) but through their inclusion in the notice the emergency rule must be self-justifying.
This conclusion does not restrict GOEA's ability to avoid federal sanctions. Rather, it simply calls GOEA to obey the law.
LOUISIANA AGING ADVISORY BOARD
You are correct that the original opinion inadvertently used a legal term of art, "advice and consent," to describe the role of the Louisiana Aging Advisory Board vis-a-vis the issuance of rules by the GOEA. The Board has an advisory role only. The material you have furnished reflecting that the Board was noticed of the rule change and invited to the public hearing to offer its advice and response substantiates that LSA-R.S. 46:934 was complied with in the administrative procedure by GOEA.
CONTRACTS
Without knowing the particulars of each contract issued under the emergency rule, an opinion as to whether their legal validity has been compromised by the invalidity of the emergency rule itself is inapposite.
One may reflect, however, that such contracts, if adversely affected by the invalidity of the emergency rule, may suffer only a relative nullity of consent which may be readily cured by ratification of one or both of the parties to your contract.
GOEA's regular counsel has been afforded an opportunity, as is the regular practice with opinions in the Department of Justice, to review and criticize both the original and this supplementary opinion before
they were issued. He is the appropriate person to direct questions to regarding the validity of contracts.
Trusting this to be of sufficient information, I am
Sincerely,
 WILLIAM J. GUSTE, JR. Attorney General
 BY: __________________________ CHARLES J. YEAGER Assistant Attorney General
CJY:tm
OPINION NUMBER 02-0258
September 13, 2002
71-1-B MUNICIPALITIES — Home Rule Charter La. Const. Art. 6 § 5(E) La. Const. Art. 6 § 44(5) LSA-R.S. 43:144
Where a home rule charter specifies requirements more stringent than that required by the Constitution or state law to adopt ordinances, those requirements must be complied with.
Mr. Gerald "Buzz" Breaux President Lafourche Parish P. O. Drawer 5548 Thibodaux, LA 70302
Re: Enactment of Ordinances Pursuant to the Lafourche Parish Government Home Rule Charter
Dear Mr. Breaux:
Your request for an opinion regarding the legal requirements for the enactment of ordinances by the Lafourche Parish Council has been received and forwarded to me for response. Within your request, you have specified three issues of concern that will serve as the organizational scheme for the responses that will follow.
The first issue requests an opinion on the legality of the action taken on the proposed ordinances since they were not published within fourteen days of introduction. The second issue requests an opinion on the legality of the ordinances adopted at the public hearing, notice of which was published on June 10th and the hearing held on June 11th. The third issue, the legality of the newly appointed Official Journal — theTri-Parish Times, we understand to now be moot as the Tri-Parish Times
has declined appointment as the Official Journal of Lafourche Parish.
Local governments derive their authority to adopt a home rule charter from Article VI, Section 5 of the Louisiana State Constitution. La. Const. Art. 6 § 5(E) further states: "A home rule charter adopted under this section shall provide the structure and organization, powers, and functions of the government of the local governmental subdivision, which may include the exercise of any power and performance of any function necessary, requisite, or proper for the management of its affairs, not denied by general law or inconsistent with thisconstitution." (Emphasis added). La. Const. Art. 6 § 44(5) defines "general law" as "a law of statewide concern enacted by the legislature which is uniformly applicable to all persons or to all political subdivisions in the state or which is uniformly applicable to all persons or to all political subdivisions within the same class."
Therefore, a home rule charter may contain more stringent requirements than the Louisiana Constitution or general law, but may not conflict with or supercede either.
The Lafourche Parish Home Rule Charter (hereinafter "Lafourche Charter") Article IV (Ordinances and Resolutions), Section B(4) provides that "each proposed ordinance shall be published in the official journal of the parish within fourteen days after introduction." It should be noted that Section B(4)'s requirement that proposed ordinances be published within fourteen days does not clearly allocate the responsibility to publish the required proposed ordinances upon the official journal or the public official responsible for providing the information, but presumes that the public official will furnish the information and the official journal will publish it within fourteen days. The Lafourche Charter does not state a penalty for the public official or the official journal for failure to publish the proposed ordinances within Section B(4)'s fourteen day time period.
LSA R.S. 43:144, on the other hand, applies to all "[minutes], ordinances, resolutions, budgets, and proceedings for publication" and squarely places the statutory requirement upon "The official of any municipal corporation, police jury or school board by law responsible for the preparing and recording of the official proceedings" by providing for penalties of $25 to $500 and/or imprisonment of not less than ten days nor more than six months for failure to furnish the official journal with a copy of the minutes, ordinances, etc. within "[ten] days from the date of any meeting at which the official proceedings were had. . ." Thus, care should be taken that the material required to be published must befurnished to the official journal within the R.S. 43:144 ten day time period, and not simply rely upon Section B(4)'s requirement that proposed ordinances be published within fourteen days of introduction.
There are two additional requirements in the Lafourche Charter pertaining to the publication of ordinances actually enacted. Section B(8) states: "After an ordinance has been enacted, it shall be published in the official journal of the parish." Section B(9) states: "An ordinance shall become effective on the tenth day after final publication, unless a later date is provided therein. In no event shall an ordinance become effective within ten days after final publication."
Thus, reading Sections B(4), B(8), and B(9) of the Lafourche Charter inpara materia requires: a) publication of the ordinance within fourteen days of introduction and b) publication after enactment but at least ten days prior to the ordinance taking effect. Therefore, if the publication of the proposed ordinance was not within fourteen days of introduction, or there was no final publication subsequent to enactment, the statute cannot take effect. Further, LSA 43:144 imposes monetary penalties and/or imprisonment for failing "[to] furnish the official journal with copy of the minutes, ordinances, resolutions, budgets, and proceedings for publication" within "[ten days
In Attorney General Opinion 80-1113 (copy enclosed), this office examined the consequences of failing to properly publish ordinances adopted by a home rule charter jurisdiction. In that opinion, this office concluded that ordinances adopted and not correctly published (as opposed to ordinances adopted and never published at all) could be re-introduced, ratified by the governing body, and correctly published in accordance with the pertinent home rule charter provisions. While there are now specific statutory requirements regarding publication of ordinances, it remains the opinion of this office that ordinances adopted, but not correctly published, must be properly re-introduced, ratified by the Lafourche Parish Council, and correctly published in accordance with state law and the Lafourche Charter.
Regarding the notice requirements for public meetings held to adopt an ordinance, Article IV, Section B of the Lafourche Charter contains quite specific requirements regarding the enactment of ordinances. Section B(5)(a) states "There shall be a general public hearing for every proposed ordinance. The date, time, and place of the public hearing or hearings shall be published in the official journal of the parish not less than five nor more than fourteen days prior to such hearing or hearings." (Emphasis added). Using the same reasoning as stated above, it is the opinion of this office that any ordinances adopted in contravention of any of the requirements contained in the Lafourche Charter pertaining to the adoption of ordinances should be properly re-introduced, ratified, and correctly published.
I trust this addresses the concerns presented in your opinion request. Please feel free to contact this office in the future should you require further information or assistance.
Yours very truly,
 RICHARD P. IEYOUB ATTORNEY GENERAL
 ______________________________ THOMAS L. ENRIGHT, JR. Assistant Attorney General
RPI/TLE;dsc
Enclosure
Date Released: September 13, 2002
OPINION NUMBER 80-113
March 24, 1980.
71 Municipalities La.R.S. 33:151, et seq. La.R.S. 33:171, et seq. La.R.S. 33:172 (C)
A municipality may extend its corporate limits, through annexation, by either an election or ordinance upon the submitting of a proper petition by the residents. A municipality may also extend its municipal limits on its own where the boundary to be annexed is 90% common to the boundary of the municipality. A municipality is not required to extend its territory unless it deems it in the best interest of its citizens.
Honorable James H. Cockerham Mayor Town of Ridgecrest Ridgecrest, Louisiana 71334
Dear Mayor Cockerham:
You have asked for an opinion from this office concerning the procedure for annexing and thereby enlarging municipal limits.
Specifically, you advised that there is a plot of land adjacent to the municipality and which is surrounded on two sides and a part of a third by the town. You have asked if the town is required to incorporate this area upon the petition of a resident or residents of the subject area.
The procedure for municipal annexation is contained in La.R.S. 33:151, et. seq and La.R.S. 33:171, et. seq.
La.R.S. 33:151 provides for annexation of adjacent territory through an election:
 Whenever one-third in number and value of the bonafide owners of any lots or land, lying contiguous and adjacent to the territorial corporate limits of any city or town, the City of New Orleans excepted, or, whenever one-half in number and value of the bonafide owners of any lots or land, lying contiguous and adjacent to the corporate limits of any city located in a parish, which parish has a population of between 115,000 and 125,000 persons, desire that such lots or land be annexed to and included in the territoral corporate limits of any such adjacent or contiguous city or town. . . .
In accordance with La.R.S. 33:153, et. seq an election is held in which those persons residing in the subject area vote on whether or not the proposed area should be annexed.
A municipality's boundries may also be enlarged by a petition and ordinance as opposed to an election in accordance with La.R.S. 33:171, et. seq.
In this case:
 No ordinance enlarging the boundaries of municipalities shall be valid unless prior to the adoption thereof, a petition has been presented to the governing body of a municipality containing the written assent of a majority of the registered voters and the majority in number of the resident owners as well as twenty-five percent in value of the property owners within the area proposed to be included in the corporate limits according to the certificate of the parish assessor.
At its own option, a municipality may annex territory by ordinance, provided that at least 90 percent of the boundary of the area to be annexed is common to the boundary of the municipality. La.R.S. 33:172
(c)
In addition, a municipality may call a special election to seek approval of 25 percent of the residents of the proposed area to be annexed, which election can be called without the necessity of the aforementioned petition. La.R.S. 33:172
It is quite apparent that a municipality is not required to annex territory, either by calling an election or by ordinance, if it deems that such annexation is not in the best interest of the community. The power to extend or contract corporate limits of municipalities is a legislative power which is an incident to its power to create or abolish municipalities. A state legislature may enact a statute annexing contiguous territory or authorizing a procedure for annexation, to become opera hive upon the happening of certain contingencies. State ex rel. Kempv. the City of Baton Rouge, 215 La. 315, 47 So.2d 744 (La. 1949). This legislative power has been delegated to municipalities by virtue of La.R.S. 33:153 which states that the municipality may call an election upon the presentation of the proper petition. It does not require the municipality to call such an election. We can find no law which requires the municipality to extend its territory if the governing body does not deem it in the best interest of its citizens.
However, a municipality may extend its territory on its own option by virtue of the aforestated La.R.S. 33:172 (C) where the property to be annexed is at least 90 percent common to the boundary of the municipality. In so doing, the general law is that such annexation, regardless of whether it is done at the option of the municipality or by petition of the residents, must be reasonable. Reasonableness in enlargement of municipal boundries is determined by a number of factors such as a substantial increase in population; a need for additional area for construction of homes, mercantile, manufacturing or industrial establishments; a need for the extension of police, fire, sanitary protection or other municipal services to substantial numbers of residents of adjacent areas. Kansas City Southern Railway v. City of Shreveport,354 So.2d 1362 (La.Sup.Ct. 1978).
If you have futher questions regarding annexation then please feel free to call or write at any time.
With kindest personal regards, we remain,
Very truly yours,
 WILLIAM J. GUSTE, JR. Attorney General
 By: __________________________ David C. Kimmel Assistant Attorney General
WJG, JR/DCK/jm